| | |
|---|---|
| **ABRAHAM S. HEYMAN and**<br>**GEULA HEYMAN,**<br><br>   **Plaintiffs,**<br><br>   v.<br><br>**CITIMORTGAGE, INC.,**<br><br>   **Defendant.** | Civ. No. 14-1680-KM-MAH<br><br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

## I.    Introduction

Abraham and Geula Heyman, husband and wife, represented at all relevant times by counsel, have brought this action against their mortgage servicer, Citimortgage, Inc. ("Citi"). On October 5, 2006, the Heymans obtained a $435,000 mortgage at a fixed interest rate of 6.75%. They occupied one part of the mortgaged two-family home, and apparently maintained the other as an income-producing rental apartment.

In 2011, the Heymans stopped making monthly mortgage payments. By September 2012, they were some $62,000 in arrears. At about that time, they proposed a short sale of the property. The reason for seeking a short sale, testified Mr. Heyman, was that his family was growing, and he wished to "walk away" from this mortgage and move to a bigger home. Citi made a proposal pursuant to which a short sale of the property for $235,000 would be deemed to satisfy the outstanding balance of $400,000. The Heymans did not agree because they objected to Citi's requirement that they contribute $5000 in cash.

In mid-2013, with the advice and participation of counsel, the Heymans requested from Citi a loan modification under the Department of Treasury's Home Affordable Modification Program ("HAMP"). In keeping with HAMP guidelines, they were required to make three trial payments during the months of June, July, and August of 2013. Following successful completion of the trial

1

payments, Citi would offer an agreement for permanent modification of the loan.

The Heymans successfully made three HAMP trial payments in the months of June, July, and August of 2013 (as well as a payment in May, the status of which is disputed). Citi therefore presented the Heymans with a proposed modified loan agreement. The Heymans executed the agreement, and the loan was modified as of August 1, 2013. The then-outstanding principal balance was reduced from $516,662.50 to $341,350.80; the interest rate of 6.75% was reduced to 5.25%. The Heymans made one regular payment under the loan modification agreement in September 2013, but made no further payments.

The Heymans make many objections to the effect that the modification agreement they signed was not HAMP-compliant. Chief among them is the objection that the monthly payment calculated by Citi exceeded 31% of their monthly income. They point to inconsistencies in Citi's statements about their monthly income, but have declined to offer evidence or even state what their monthly income was.

In 2014, the Heymans moved out of their portion of the two-family house, and they now live elsewhere. Since then, they have maintained the house as an income-producing property, collecting rent on the two apartments. Except for the payments made in connection with the trial period and loan modification in 2013, they have made no payments of principal, interest, or taxes in the eight years since 2011.

The Heymans' Second Amended Complaint asserts eight causes of action against Citi: (1) violation of the New Jersey Consumer Fraud Act ("CFA"); (2) promissory estoppel; (3) conversion; (4) negligent misrepresentation; (5) breach of contract; (6) unjust enrichment; (7) slander of title; and (8) violation of the Real Estate Settlement Procedures Act ("RESPA"). The Heymans allege primarily that they were orally promised a 2% interest rate, but the written loan modification agreement they signed imposed a rate of 5.25%; that the monthly mortgage payment exceeded 31% of the Heymans' monthly gross

income, in violation of HAMP guidelines; that late fees were not waived; and that an appraisal fee should not have been assessed.

Before the Court are two motions filed by Citi:

(1) a motion for summary judgment (DE 104); and

(2) a motion to assign rental income, or, in the alternative, to appoint a rent receiver (DE 103).

For the following reasons, Citi's motion for summary judgment is granted. Citi's motion for the assignment of rental income, or to appoint a rent receiver, is denied.

## II.    Home Affordable Modification Program (HAMP)

Before addressing the merits, I provide some background on HAMP and its guidelines, which governed the terms of the loan modification granted by Citi in 2013.

In response to the downturn in the financial markets in 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 ("EESA"). P.L. 110–343, 122 Stat. 3765, 12 U.S.C. §§ 5201–5261; *see Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012). The "centerpiece" of the EESA "was the Troubled Asset Relief Program (TARP), which required the Secretary of the Treasury . . . to 'implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of . . . available programs to minimize foreclosures." *Wigod*, 673 F.3d at 556 (quoting 12 U.S.C. § 5219(a)).

In February of 2009, the Secretary of the Treasury set aside $50 billion in TARP funds to induce lenders to refinance mortgages with more favorable interest rates to help homeowners avoid foreclosure. *Id.* The Secretary negotiated Servicer Participation Agreements with home loan servicers. Under those agreements, servicers agreed to identify homeowners in default and to modify those homeowners' loans under the program. *Id.* For each modification, loan servicers received a $1,000 payment, as well as other incentives. *Id.*

Also in February of 2009, "President Obama announced the Homeowner Affordability and Stability Plan . . . which spawned the Home Affordable Modification Program ('HAMP') managed jointly by the Treasury Department and the Department of Housing and Urban Development." *Thomas v. U.S. Bank Nat. Ass'n,* 474 B.R. 450, 452 (D.N.J. 2012) (internal citations omitted). HAMP is one of four foreclosure mitigation programs instituted under the Treasury Department's and HUD's Making Home Affordable program ("MHA"). *Id.*

Under HAMP, participating lenders will modify the terms of a loan for a borrower that meets certain criteria, pursuant to a three-step process:

First, the servicer confirms that the mortgagee meets the threshold income and property-related requirements. *Id.* at 455.

Second, the servicer calculates the modification using a "waterfall" method "that is designed to downwardly adjust the monthly mortgage payment to around 31 percent of the mortgagee's income." *Id.* The order of operations in the waterfall method is to (1) capitalize accrued interest and escrow advances to third parties; (2) reduce the annual interest rate to as low as two percent; (3) extend the term up to 40 years and re-amortize the loan; and (4) if necessary, forbear repayment of principal until the loan is paid off and waive interest on the deferred amount. *Wigod* 673 F.3d at 557 n.1 (citing U.S. Dep't of the Treasury, Home Affordable Modification Program Supplemental Directive 09–01 (Apr. 6, 2009)).

Third, the servicer applies the "net present value (NPV) test to determine if the modification would be more profitable to the servicer than foreclosure." *Thomas,* 474 B.R. at 455 (citation omitted). If the value of the modified mortgage is lower than the servicer's expected return after foreclosure, then the servicer is not obligated to offer a loan modification. *Id.; see also Wigod,* 673 F.3d at 557.

> A borrower will qualify for HAMP only if the interest rate on the mortgage loan can be reduced by at least 0.125 percent without the modified monthly mortgage payment ratio going below 31 percent. If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not

> satisfy HAMP requirements and no incentives will be payable in
> connection with the modification.

*Phipps v. Wells Fargo Bank, N.A.*, 2011 WL 302803, at *10 (E.D. Cal. Jan. 27,
2011) (quoting Making Home Affordable Program, Handbook for Servicers of
Non–GSE Mortgages Version 3.0, § 6.3).

Once a borrower is qualified for a HAMP loan modification, the
modification process itself proceeds through two stages. *Wigod*, 673 F.3d at
557. After determining that a borrower is eligible under HAMP, the borrower
and servicer enter a "trial period" of three months or more. During the trial
period, the provisional loan repayment terms consist of those formulated by the
servicer using the waterfall method. *Id.* at 557. If the borrower meets his or her
obligations during the trial period, then the servicer may offer a loan
modification that is permanent. *See Sinclair v. Citi Mortgage, Inc.*, 519 F. App'x
737, 738 (3d Cir. 2013); *Wigod*, 673 F.3d at 554.

A servicer's participation in the Department of Treasury's program "is
governed by a set of guidelines (referred to as 'the HAMP Guidelines') that apply
to those servicers who executed a Servicer Participation Agreement ('SPA') in
exchange for federal funds." *Thomas*, 474 B.R. at 454 (citation omitted).
Servicers that do not comply with HAMP Guidelines "may be held in default of
their obligations under the SPA." *Id.*; *see also Rost v. Avelo Mortgage, LLC*, 2015
U.S. Dist. LEXIS 148703, at *16 (D.N.J. 2015).

## III. Facts and Procedural History[1]

On Citi's motion for summary judgment, the Court is required to identify undisputed and disputed issues of fact, and to interpret disputes in favor of the Heymans. Unless otherwise indicated, the facts recited below are undisputed for purposes of Fed. R. Civ. P. 56.

### A. Origination of the Loan

On October 5, 2006, GFI Mortgage Bankers, Inc. ("GFI") provided the Heymans with a loan in the amount of $435,000.00. (DSMF ¶1; PRS ¶1). The loan is evidenced by a promissory note, signed by Mr. Heyman. (Farmer Decl. ¶2 & Ex. A, Interest-Only Period Fixed Rate Note (the "Note")). The Note is secured by a mortgage, signed by Mr. and Mrs. Heyman, with GFI as mortgagee. (DSMF ¶2; DE 104-4 (Nov. 29, 2017 Deposition of Abraham Heyman, 70:14-25, 71:1-3, 73:8-20 ("Mr. Heyman Dep."))). The mortgage encumbers a property and two-family dwelling located on Pennington Avenue in Passaic County (the "Pennington Avenue Property"). (DSMF ¶2; PRS ¶2; Mr. Heyman Dep. 73:14-16, 19:13-14). The Note bears a 6.75% interest rate, and requires monthly payments of principal, interest, and escrow on the first day of each month, beginning on December 1, 2006. (Farmer Decl. ¶2 & Note (Ex. A)).

---

[1]   Certain key items from the record will be abbreviated as follows:

DE __ = Docket entry number;

SAC = Second Amended Complaint (DE 39);

Farmer Decl. = Declaration of Pamela Farmer (with Exhibits), dated Oct. 26, 2018 (DE 104-3);

DSJBr = Defendant Citi's Summary Judgment Brief (DE 104-2);

DSMF = Defendant Citi's Statement of Undisputed Material Facts (DE 104-1);

PSJBr = Plaintiffs' Brief in Opposition to Summary Judgment (DE 110);

PRS = Plaintiffs' Response to Citi's Statement of Material Facts (DE 110-1);

DSJRBr = Citi's Reply Brief on Summary Judgment motion (DE 121);

DRRBr = Citi's Brief in Support of Motion for Rent Receiver (DE 103-1);

PRRBr = Plaintiffs' Brief in Opposition to Motion for Rent Receiver (DE 115);

DRR Reply = Citi's Reply Brief in Support of Motion for Rent Receiver (DE 120).

Citi has introduced an Assignment of Mortgage dated October 5, 2006, reflecting that the Heymans' mortgage was assigned from GFI to Citi. (DSMF ¶3; Farmer Decl. Ex. C ("Assignment of Mortgage")). The Assignment of Mortgage specifically identifies the Pennington Avenue Property and the mortgage "made by Abraham Heyman and Geula Heyman" on October 5, 2006 to GFI. (Farmer Decl. Ex. C). The Assignment of Mortgage was recorded with the Passaic County Clerk's Office on November 16, 2006. (Farmer Decl. Ex. B).

The Heymans assert that "this assignment appears to be fraudulent. No signature can be discerned on the note allonge." (PRS ¶3 (citing Note)). However, the Note allonge and the Assignment of Mortgage both contain a signature over the typed name of Abraham Eisner, the Vice President of GFI. (*See* Farmer Decl. Ex. C; Note).[2] The Heymans do not point to any other indicia of "fraud." Accordingly, Citi's properly supported factual assertion that the mortgage was assigned from GFI to Citi is deemed undisputed. *See* Fed. R. Civ. P. 56 (e)(2).

On April 4, 2014 (after most of the events in suit), Citi assigned the mortgage to "US Bank National Association as Trustee." (DSMF ¶4; Farmer Decl. Ex. D). Like the previous assignment, this assignment names the Heymans as the mortgagors and identifies the encumbered Pennington Avenue

---

[2]     A party, and *a fortiori* that party's counsel, cannot create an issue of fact by simply declaring themselves unsatisfied with the other side's proofs. Mr. Eisner's signatures on the Note and Assignment of Mortgage appear similar; apparently that is how he signs his name. (*See* DE 104-3, Ex. C; Note). Nothing on the face of these business records suggests fraud, and plaintiff has produced no evidence (*e.g.*, a deposition of Eisner) in support of counsel's equivocal assertion that the documents "appear to be" fraudulent. *See Assadourian v. Harb,* 2010 WL 2560495, at *4 n.2 (D.N.J. June 21, 2010) ("[A]rgument by counsel unsupported by any evidence in the record . . . woefully fails to satisfy Plaintiff's obligation under Local Rule 56.1."); *see also Walters v. Carson,* 2013 U.S. Dist. LEXIS 178249, at *35 n.11 (D.N.J. Dec. 19, 2013). As noted "time and again, evidence -- not attorney argument -- creates genuine issues of material fact." *Ecolab, Inc. v. Amerikem Labs, Inc.,* 98 F. Supp. 2d 569, 584 (D.N.J. 2000); *see also* Fed R. Civ. P. 56(c), (e) (providing that, in opposing summary judgment, nonmoving party cannot rest upon mere allegations but must present actual evidence that creates a genuine issue of material fact).

Property. (Farmer Decl. Ex. D). [3] In response to this factual allegation, the Heymans assert that "Citi could not assign the note that it did not own." (PRS ¶4). This opaque assertion does not contain a citation to the record and thus does not create a disputed issue of fact. (*See* PRS ¶4; Fed. R. Civ. P. 56(e)(2)). To the extent it may incorporate the earlier allegation that the GFI/Citi assignment was "fraudulent," it fails for the same reason. (*See* p. 7 & n.2, *supra*.)

### B. Loan Default and Short Sale Proposal

In 2011, the Heymans defaulted on their loan when they failed to make monthly payments. (DSMF ¶5; PRS ¶5). After defaulting, Mr. Heyman contacted Citi to request review of an application for a short sale of the property,[4] as part of a plan to "walk away" and obtain a bigger home for his growing family. (DSMF ¶6; PRS ¶6).[5]

---

[3]     The Heymans' papers repeatedly state that Citi "released" the mortgage, implying that for some reason it just relinquished its rights. There is evidently a document recorded in the Passaic County Clerk's Office on April 28, 2014, under the title "release of mortgage." That document, however, is simply a copy of the HAMP loan modification agreement that was executed in 2013. (*See* DE 83, at 7; Passaic County Clerk's Office, Public Record Electronic Search System, *available at* http://records.passaiccountynj.org/press/Clerk/ClerkHome.aspx?op=basic.

A title search of filings in the Passaic County Clerk's Office establishes that the Mortgage was assigned from GFI to Citi, and then (after the major events in suit) to U.S. Bank National Association as Trustee. The Heymans' argument that Citi could not enter into the modification agreement because it had "voluntarily released" the mortgage is without foundation. *See* Section IV.C., *infra*.

[4]     "A 'short sale' in real estate occurs when the outstanding loans against a property are greater than what the property is worth and the lender agrees to accept less than it is owed to permit a sale of the property that secures its note." *Laughlin v. Bank of Am., N.A.*, 2014 WL 2602260, at *1 n.4 (D.N.J. June 11, 2014).

[5]     Q . . . And why were you seeking to enter a short sale?

A Because I needed a bigger house because I have now four kids, and I needed a bigger place.

Q So you needed a bigger house, but you couldn't make the payments, you said, under this mortgage. Correct?

A Correct.

Q So you were seeking a short sale because you just wanted to move because were you looking for a bigger house or because the loan was in default?

By letter dated October 15, 2012, Citi approved the request for a short sale with the following terms: The closing was to occur on or before November 26, 2012; the sale price would be $235,000; the closing costs would not exceed $25,643; and the Heymans and the purchaser would make a cash contribution of $5,000. (DSMF ¶7; Farmer Decl. ¶6 & Ex. E).[6] Under these terms, the Heymans' loan, which had a past due amount of approximately $62,000 and an outstanding balance of $400,000, would be deemed satisfied. (Mr. Heyman Dep. 98:4-10; Ex. SJ-D, DE 110-3 at 108). The Heymans rejected Citi's short sale terms because they objected to making the $5,000 contribution.

### C. HAMP Modification

#### 1. April 30, 2013 telephone call

Instead, the Heymans requested to be reviewed for a loan modification under HAMP. (DSMF ¶8; PRS ¶8). During this process, the Heymans assert, a "representative" of Citi "informed" Mr. Heyman "that he would receive a 2% interest rate and 3.75% lifetime" under the terms of the modified loan. (PSJBr at 8, 11). In what appears to be Citi's call log for Mr. Heyman, the entry dated April 30, 2013 contains the following notation:

> brw call in to get info on approval. States got info approved for
> HAM. Wanted details. lnfomred approved and setup ton tpp

---

A It's a -- the whole entire picture.

Q So short sale just represented an option to just sort of walk away from the property?

A Correct.

(Mr. Heyman Dep. 59:8-60:3)

6      In response to this factual assertion by Citi, the Heymans state as follows: "admitted, specifically that the plaintiffs had to 'contribute' $10,000 (which Citi then adjusted to $5,000) to Citi in order to complete the short sale. Although Citi was supposed to offer an incentive under HAFA for the short sale, instead it offered a disincentive. See plaintiffs' brief." (PRS ¶7). Plaintiffs' brief states that "Defendant [Citi] admits they demanded a monetary contribution from the Heymans in order to conduct a short sale, [Citi] originally requested $10,000 contribution to conduct a short sale." (PSJBr at 7). The Heymans' failure, again, to cite to the record, permits the Court to deem this fact undisputed. See Fed. R. Civ. P. 56(a)(2). Moreover, Mr. Heyman testified that it was his realtor, not Citi, who told him that he was required to make a $10,000 contribution. (Mr. Heyman Dep. 86:14-25).

> beginning in june until august. Informed tpp amt $3438.76. p&I
> 2057.76 escrow 1382.56.[7] infomred apr down to 2% and lifetime
> rate of 3.37% based on uw notes. infomred wil recieve tpp ltr
> inmail and after tpp's will recieve final mod docs to review,
> sign/date and return. brw ack. no other questions.

(DE 110-3 at 81, Pltfs' Ex. C [punctuation and spelling *sic* in original]; Mr.
Heyman Dep. at 146:8-149:4[8]). The Heymans argue that Citi orally offered a
2% interest rate, which induced them to make the TPP payments and to enter
into a loan modification agreement. (PSJBr at 8; 11, 16-19; DE 110-3, at 73,
Pltfs.'s Ex. C).[9]

### 2. The May 3, 2013 Trial Period Plan ("TPP") Letter

Citi reviewed the Heymans' financial information, and by letter dated
May 3, 2013, approved the Heymans for a Trial Period Plan ("TPP") under the
MHA. (DSMF ¶9; PRS ¶9; Farmer Decl. Ex. G (the "TPP Letter")). The TPP Letter
is a four-page document, consisting of a one-page letter, two pages of
Frequently Asked Questions, and a page entitled "Important Program Info
(Additional Trial Period Plan Information and Legal Notices)."

The TPP Letter advises the Heymans that, in order to qualify for a
permanent loan modification, they must make three trial payments in the
amount of $3,438.76 by the first of each month during the trial period (June,
July, and August of 2013). (TPP Letter; DSMF ¶10; PRS ¶10).

Page one of the TPP Letter clearly and repeatedly states that each of the
three monthly trial payments for June, July, and August 2013, listed

---

[7]    Principal & interest of $2057.76 plus an escrow payment of $1382.56 would
actually total $3440.32, a figure within two dollars of the estimated monthly payment
of $3438.76.

[8]    Mr. Heyman testified that he was promised a 2% interest rate on the phone by a
Citi representative in or before May 2013 but could not identify the person to whom he
spoke. (Mr. Heyman Dep. at 146:8-149:4). The only documentary evidence in the
record to support Mr. Heyman's claim is the April 30, 2013 call log.

[9]    The log indicates that an individual named "Jorge Lopez" inputted this
comment. (DE 110-3, at 81, Pltfs.'s Ex. C; *see also* DE 110-3, at 64, 174, Pltfs' Ex. C,
E). There is no deposition testimony or declaration from Mr. Lopez clarifying or
explaining the notation.

separately, shall be in the amount of $3438.76.[10] Enclosed with the TPP Letter are "payment coupons" for the three TPP trial payments. These coupons, too, reflect that the amount of the trial payments would be $3438.76, and specify that the enclosed payment is for the "Trial Amount Due." (TPP Letter).[11]

The Frequently Asked Questions attachment, however, contains a passage that is grammatically, mathematically, and substantively confusing:

### Q. How was my new payment in the trial period determined?

Your trial payment is approximately 31% of your total gross monthly income, which we determined to be $2,005.00 based upon the income documentation you provided.

---

[10] Under the HAMP regulations, that payment would set at a maximum of 31% of gross monthly income. Attached to Citi's papers is a printout of a Servicer Case Resolution form that Citi submitted to the HAMP Solution Center some months later, on January 3, 2014. (Pamela Decl., ¶8 & Ex. F). This form states that the Heyman's gross monthly income was $11,090.17. By my calculation 31% of that figure equals $3437.95. The actual trial payment amount was $3438.76, which is 31% of $11,092.77. The figures, then, do not precisely match but are within a few cents of each other.

[11] Each coupon looks like an ordinary by-mail remittance slip, providing for payment by enclosed check:

| Return this temporary coupon with payment. | | | |
|---|---|---|---|
| Account Number: | See detail below: | Due Date: 7/1/13 | Total Trial Amount Due: $3,438.76 |
| ☐ Please check box to indicate mailing address/phone number changes and enter on reverse side. Include account number on check and make payable to: | Trial payment: $3,438.76 | $ | 3 4 3 8.7 6 |
| CITIMORTGAGE INC. PO Box 688950 Des Moines, IA 50368-8950 | Total Amount Enclosed | $ | ▪ |

Please do not send cash. Please allow 7 to 10 days for postal delivery.
To ensure timely processing of your mortgage payment, please use the enclosed envelope and coupon. Do not include account inquiries with your payment.

(TPP Letter).

(TPP Letter). That figure of $2,005.00 does not seem to correspond to anything else in the record. The pronoun "which," moreover, could refer to either "your gross monthly income" or "31% of your gross monthly income."

The FAQ section clarifies that the Heymans would not be charged "any fees for this trial period plan or a permanent modification." (TPP Letter, at 2). The letter represents that, if the loan is permanently modified, Citi will "waive all unpaid late charges." (Id.).

The TPP Letter cites an "escrow shortage" of $7,941.94, which would affect the amount available to pay property taxes and insurance premiums. (Id.). The escrow shortage could be paid as a lump sum when the loan was modified, or in the amount of $132.37 per month over the course of 60 months. (Id.).

The TPP Letter calculates only the amount of the trial payments; it does not set forth the terms of the permanent modification that would occur if the Heymans successfully completed the TPP. In particular, the TPP letter does not specify any interest rate, monthly principal, or escrow payments for the permanent modification. (TPP Letter; DSMF ¶11; PRS ¶11). However, the TPP Letter does provide an *estimated* interest rate: "If we were able to permanently modify your loan today, we estimate your modified interest rate would be 5.000%." (TPP Letter, at 2). Mr. Heyman read the TPP Letter and understood that this was an estimated rate. (Mr. Heyman Dep. 113:24-114:12).

With respect to any permanent modification that might ensue, the TPP Letter further provided that the "interest rate and monthly principal . . . will be fixed for the life of your mortgage unless your initial modified interest rate is below current market interest rates." (TPP Letter at 3). In the event that the Heymans were given a below-market interest rate, that rate would be fixed for five years, and then increased by 1% per year until it reached a "cap." (Id.). The cap would equal "the market rate of interest being charged by mortgage lenders" on the day the "modification agreement is prepared (the Freddie Mac Primary Mortgage Market Survey® rate for 30-year fixed rate conforming

12

mortgages)." (*Id.*). Mr. Heyman testified that Citi "promised me one thing verbally on the phone and then sent me this trial payment plan which had different terms." (Mr. Heyman Dep. at 148:20-22).

The TPP specifies that the original loan documents remain in effect. It provides, however, that the Heymans would be permitted to make the three trial-period payments in lieu of the amounts required under the original loan documents. (TPP Letter, at 4).

### 3. The "June trial payment" dispute and the three trial payments

There is no dispute that the Heymans made the three trial payments. They contend, however, that Citi took advantage of an ambiguity regarding the due dates and that, as a result, they actually made four.

The TPP letter is dated May 3, 2013. On May 16, 2013, Citi received a check in the amount of $3,450 from Mr. Heyman, drawn on Chase Bank.[12] (DSMF ¶12; PRS ¶12). Mr. Heyman, it must be said, was less than ideally clear about the purpose of the payment. The check was not submitted with the payment coupon from the TPP Letter. Its dollar amount slightly exceeded the trial payment amount stated in the TPP Letter, which was $3,438.76. (DSMF ¶12; PRS ¶13).

The obligation to make regular monthly payments on the mortgage was, of course, ongoing. Although payments had not been made for a long time, there was no reason in theory that they could not have been resumed.[13] Citi in effect treated the May 16, 2013 payment as a regular monthly payment, and credited it against the outstanding balance of the loan, pursuant to the terms of the original Note. (DSMF ¶14). Mr. Heyman objects; Citi, he says, was obligated to credit this May 16 check as the first trial payment, due on June 1, 2013.

---

[12]    Citi received the check on May 16, 2013. The payment information indicates that Mr. Heyman sent the check on May 9, 2013. (Farmer Decl. Ex. H).

[13]    The sending of the TPP Letter did not affect the Note or mortgage, which remained in full effect during the trial period. (TPP Letter at 4).

Little is at stake. If credited as a regular May loan payment, this amount would not be lost, but would serve to reduce the arrearage. And it is undisputed that the Heymans made three subsequent trial payments, so any error in crediting the May 16 payment would not have jeopardized, and in fact did not jeopardize, their participation in the TPP. Nevertheless, the parties spill a great deal of ink on this issue. As it happens, both sides' supporting arguments are of little assistance to the Court.

The Heymans claim that "[s]ince the payment was made after May 15, it could not be considered a May payment but rather a June payment according to the tpp. Further the tpp did not require that payment coupons must be used, further, original gfi mortgage papers or tpp did not disallow additional payments to be made." (PRS ¶13). There is no support, and they cite none, for the view that a payment, because it was made after the 15th of the month, must be credited to the following month (even if no payment is made for the current month, it seems). Neither the TPP Letter nor the loan documents so provide. And in any event, the Heymans had then made *no* payments on the loan since 2011. There was absolutely no danger of overpayment or double payment.

As to the due date, the TPP letter seems clear enough. It states "1st payment: $3,438.76 *by* 6/1/13." *Id.* (emphasis added). At the top of the TPP, in bold, large, type, set off in a box, there is a similar message, although without the word "by": "**1st Trial Payment Due: 6/1/13**". The Heymans assert that their payment was made on May 16, and hence was made "by" the due date of June 1, as required by the TPP Letter. (PRS ¶14).

Citi concedes that the payment was early enough, but carps that it was *too* early. The May 16 payment, says Citi, cannot be regarded as the first trial payment because it was received "prior to the month it [the trial payment] was due," *i.e.*, June. Citi, as it must, acknowledges the "by 6/1/13" language in the TPP. An attachment to the TPP Letter, "Additional Trial Period Plan Information and Legal Notices," states that "[t]he terms of the trial period plan below are

14

effective on the day you make your first trial period payment, provided you have paid it *on or before* 6/1/13." (*Id.* (emphasis added)).

But Citi also points to the following passage, on page 1 of the TPP:

If each payment is not received by [Citi] *in the month in which it is due,* this offer will end and your loan will not be modified . . . ."

(TPP, at 1). The "month in which [the payment was] due," says Citi, was June, not May. So unless the payment was received in June, it cannot be regarded as the first, June 1 trial payment.

I will dispose of this (non-)issue of fact now. "By" a certain date, in common parlance, means on or before that date. *See* Black's Law Dictionary (free online edition), "By" (Example: "A contract to complete work by a certain time, means that it shall be done before that time."), https://thelawdictionary.org/letter/b/page/110/.

Consider the implications of Citi's contrary interpretation of the TPP. Citi seemingly expects the reader to put the cited sentences together and conclude that payment is required (1) in June, but (2) not later than June 1. That is a very roundabout way of conveying "on June 1," if that is truly what was intended. It is simply unreasonable to interpret this letter to mean that the payor, when mailing the check,[14] must bear the risk of its arriving before June 1 and therefore being invalid as a trial payment, or arriving after June 1 and therefore being untimely. Citi's position here smacks of opportunism, and I reject it.

The May 16 check, then, could and perhaps should have been credited as the first trial payment. For the reasons expressed above, however, it matters little. The Heymans subsequently *did* make three trial payments to Citi in the amount of $3,438.76, and these were duly applied to the TPP. (DSMF ¶15; PRS ¶15; Farmer Decl. ¶11).[15] Thus the Heymans successfully completed the trial

---

[14]     I note that the payment coupons bear a post office address, implying that payment would ordinarily be mailed. *See* n.11, *supra.*

[15]     The parties do not clarify when the remaining payments were received by Citi or whether the Heymans submitted these three payments with the payment coupons.

period that was a prerequisite to Citi's offering a permanent loan modification. They received that modification, under which they made a total of one payment. If the "third" payment were counted as a fourth payment, they could legitimately claim credit for two subsequent payments, not one. They would remain in default, and the arrearage would be the same.

At any rate, after Citi received the August payment, it mailed the Heymans a blank Home Affordable Modification Agreement. (DSMF ¶16; PRS ¶16; Farmer Decl. ¶12, Ex. K (Letter from Patricia A. Ruiz, Homeowner Support Specialist, CitiMortgage, Inc., to Abraham Heyman (Aug. 14, 2013)); Ex. J (hereinafter "Modification Agreement")).[16]

As of the effective date of the Modification Agreement, August 1, 2013, the amount outstanding under the Heymans' Note was $516,662.50. (Modification Agreement § 3(A)). That balance included the principal balance ($434,690.82), accrued unpaid interest ($58,683.36), advances for delinquent real estate taxes and insurance ($22,799.93), and appraisal fees ($488.39).

The modified principal balance in the Modification Agreement had a line for "accrued unpaid late charges," with a listed amount of "$0.00." (Modification Agreement, at §3(E)). The cover letter to the Heymans enclosing the Modification Agreement confirmed that modification of the loan would include the waiver of "all prior late charges that remain unpaid." (Farmer Decl. Ex. J). Similarly, the terms of the Modification Agreement provided that "all unpaid late charges that remain unpaid" would be waived. (Modification Agreement § 3). The provision of the Modification Agreement that addressed "Waived or Forgiven Late Charges," stated that "For and in consideration of the modification of the loan as described herein, Lender has agreed to waive or forgive accrued, unpaid late charges subject to the Borrower's compliance with

---

[16] I note that Citi's letter enclosing the new loan documents stated the following: "Be certain to make any remaining trial period payments on or before the dates that they are due. If the trial period payments are made after their due dates or in amounts different from the amount required, your loan may not be modified." (Pamela Decl. Ex. J).

the terms of this Agreement. The total amount of accrued, unpaid late charges waived or forgiven is U.S. $0.00." (Modification Agreement §3(B)).

As a result of the Modification Agreement, the Heymans' new, modified principal balance was $341,350.80. (Modification Agreement, at §3(E)). That represented a principal reduction of $175,311.70. Late charges were forgiven. The Modification Agreement provided for a 5.25% interest rate, .25% higher than the estimate in the TPP. (Modification Agreement, at § 3(F)(3)). That modified rate represented a reduction of 1.5% from the original rate of 6.75%.

The Heymans' new monthly payment was $3,446.56.[17] (Id.). Of that total, $2,120.82 represented principal and interest, and $1,325.82 was for escrow. (Id.). The Heymans executed and returned the Modification Agreement on August 22, 2013, and the loan was modified with an effective date of August 1, 2013. (DSMF ¶17; PRS ¶17). The Modification Agreement "supersede[d] the terms of any [prior] modification, forbearance, trial plan or other workout plan," if any. (Modification Agreement, at §4(B)).[18]

---

[17]     The net monthly saving is not calculated in the parties' papers. It is unclear, for example, what the monthly billed amount was immediately preceding the TPP and Modification Agreement. Attached to the plaintiff's papers, however, is a monthly billing statement dated September 18, 2012, which showed a monthly "current payment due" of $3818.26. (It also showed delinquency expenses of $380.39, a late charge of $1956, and a past due amount of $62,649.69). (Ex. SJ-D, DE 110-3 at 108).

[18]     The Heymans throw in two purported challenges to the validity of the loan modification agreement. (They do not explain why, if the loan modification agreement is invalidated, they as defaulting mortgagors are placed in any better position.)

First, plaintiffs claim they signed the loan modification "under duress." (PSJBr at 11; DE 110-3, at 82, Pltf's Ex. C (Email from Abraham Heyman to Patricia Ruiz (Aug. 22, 2013 12:19 PM) ("I signed it under 'duress' as I have to avoid and foreclosure as we have exhausted other options.")). Under New Jersey law, "the party alleging economic duress must show that [it] has been the victim of a wrongful or unlawful act or threat, and [s]uch act or threat must be one which deprives the victim of [its] unfettered will." *Cont'l Bank of Pa. v. Barclay Riding Acad., Inc.*, 93 N.J. 153, 176, *cert. denied*, 464 U.S. 994, 104 S. Ct. 488, 78 L. Ed. 2d 684 (1983). "Merely taking advantage of another's financial difficulty is not duress." *Id.* at 177. Where, as here, a party is in default of a mortgage, the economic pressure of possible foreclosure does not constitute the sort of "duress" that would invalidate a contract to modify the mortgage (in the mortgagor's favor).

Second, citing to the Pooling and Service Agreement ("PSA") between Citi and the U.S. Bank National Association, the Heymans contend that Citi was "not allowed"

Following the Modification Agreement, the Heymans made just one additional payment on the loan, in September of 2013. (They filed for bankruptcy on October 9, 2013. *See infra*.) Since then, the Heymans have made no other payments. (DSMF ¶18; DE 104-4, Ex. D (Apr. 23, 2018 Deposition of Abraham Heyman, Vol. II, 292:18-22 (hereinafter "Mr. Heyman Dep. II"))).[19]

### D. The Heymans' Complaints to the CFPB and OCC

After returning the executed Modified Agreement to Citi, Mr. Heyman submitted complaints to the Consumer Financial Protection Bureau ("CFPB") on August 29, 2013, and to the Office of the Comptroller of the Currency ("OCC") on August 30, 2013. (DSMF ¶19; PRS ¶19; Farmer Decl. Ex. L, Ex. M.). Mr. Heyman raised the following issues to the CFPB and OCC regarding the loan modification: (1) he believed that he was entitled to a 2% interest rate,

---

to "offer a HAMP complaint modification to the plaintiffs." (PRS ¶11 (citing DE 103-2, Ex. F, at 81 (hereinafter "PSA")); PSJBr at 7). The Heymans cite to the section of the PSA entitled "assumption and modification agreements." (*Id.*). That provision, however, applies if a mortgagor, like the Heymans, transfers the mortgaged property to a non-signatory of the loan. (PSA, at 81, Section 3.17). In the event of such a transfer, and if the mortgage does not contain a "due-on-sale" clause, then the PSA permits Citi to enter into an assumption and modification agreement with the original mortgagor and the transferee, provided that "no principal, interest or other payment on the mortgage loan is reduced or postponed." (*Id.*). The provision is plainly inapplicable to a mortgagor who seeks a loan modification under HAMP.

19    Despite Mr. Heyman's clear admission during the second day of his deposition that the loan has been in default since 2013, the Heymans respond to this factual assertion as follows: "The plaintiffs admit they made one additional payment in order to remain current and attempt to appeal the non hamp compliant modification, but since neither Citi nor US Trust can prove they own the note, it is difficult to say whether the plaintiffs are in default." (PRS ¶18).

The fact of default is deemed undisputed ("difficult to say" does not constitute contrary evidence). Except for the May and September 2013 payments and the three trial payments, the Heymans have made no payments on the loan since 2011. Setting aside the legal effect, if any, of their proffered reasons for nonpayment, they fail to cite to the record to establish (1) that they failed to make additional payments because they were attempting to appeal their modification; (2) the modification violated HAMP; and (3) "neither Citi nor US Trust can prove they own the note." The Assignment of Mortgages, discussed above, establishes that the mortgage was transferred to Citi from GFI in 2006, and that Citi assigned it to U.S. Bank National Association as Trustee in 2014.

instead of the 5.25% interest rate he received; (2) the May 16, 2013 payment should have been applied to the TPP; (3) Mr. Heyman received an "escrow paper," stating that the payment will increase to $365.69; (4) that although the loan modification papers stated that no "fees" would be assessed against the Heymans, he was charged an $488.39 appraisal fee; (5) his late fees were not waived; and (6) his principal balance should be reduced to $235,000, the short sale price previously offered. (Farmer Decl. Ex. L).

Citi investigated Mr. Heyman's allegations and responded to them by letter dated October 25, 2013. (DSMF ¶20; PRS ¶20; Farmer Decl. Ex. M). Citi responded to Mr. Heyman's six objections as follows:

First, under HAMP, the target loan payments are 31% of a mortgagor's gross income; not everyone qualifies for a 2% interest rate, which is the minimum; and the TPP letter itself had disclosed an estimated interest rate of 5.000%. (Pamela Decl. Ex. M, at 1). Based on Citi's review of all the Heymans' financial information, they qualified for a 5.25% interest rate. (*Id.*).

Second, the May 16, 2013 payment was credited towards the loan balance because it was received prior to the due date under the TPP. (*Id.*). Essentially, Citi asserted that it received the payment too early for the TPP. (*Id.*).

Third, the escrow notice sent to Mr. Heyman was sent before the loan modification was finalized, and therefore was not based on the updated modification terms. Accordingly, Citi later provided Mr. Heyman with an updated escrow analysis. (*Id.*).

Fourth, the Modification Agreement included a "Delinquency Expense Balance," which included appraisal fees; however, secured fees in the amount of $457.56 were waived. (*Id.* at 2).

Fifth, as for late fees, Citi's letter response stated that "Late fees incurred prior to the TPP or after the modification was finalized will not be waived," but that late fees incurred during the TPP were waived. (*Id.*). As noted above, unpaid late charges were listed as "$0.00" in the Modification Agreement.

(Pamela Decl. Ex K). The Heymans assert that the October 2013 response is an admission that late fees were not actually waived in the modified loan. (PSJBr at 12). Citi's summary judgment motion asserts that "no late fees were capitalized into the modified loan balance" (DSMP ¶21), and there is no evidence that they were.[20]

Six, regarding the short sale, Citi responded that the amount approved for the prior short sale proposal (which the Heymans rejected) is not considered when determining a loan modification; the two programs are entirely different. (Id.).

### E. The Heymans' Bankruptcy

On October 9, 2013, the Heymans filed under Chapter 7 in the United States Bankruptcy Court, District of New Jersey. (DSMF ¶22; PRS ¶22; *In re Heyman*, No. 13-32151-NLW (Bankr. D.N.J. Oct. 9, 2013)). In their bankruptcy petition, the Heymans, contradicting their position here, listed Citi as a secured creditor and stated their intention to reaffirm the loan. (DSMF ¶23; PRS ¶23; DE 104-4, at 117, 134).

Citi provided a reaffirmation agreement, outlining the unpaid principal, interest, fees, and costs due as of October 25, 2013. (DSMF ¶24; DE 104-4, Ex. G at 137-45). The interest rate was specified as 5.25%. (Id.). Citi listed the total

---

20      The Heymans respond to Citi's factual assertion as follows:

The very October 25th 2013 letter states 'no prior late fees will be waived' whilst the Hamp tpp promises that "prior late fees will be waived' as does introduction letter to the permanent HAMP and plaintiffs exhibits attached shows statement with approximate late fees prior to the Hamp. Furthermore the permanent HAMP shows $0 fees waived. The fees had to be capitalized as it was not waived as promised and cmi Admits it in the letter see also Ex SJ-D approx prior lates assessed. Citi's bare assertion as to how these fees were treated is not a substitute for the accounting that the plaintiffs requested and Citi never furnished.

(PRS ¶21). "Ex SJ-D" appears to be a monthly statement issued to Mr. Heyman from September 18, 2012, which reflects that the Heymans owed $1,956 in late charges. (DE 110-3, at 108, Pltf.'s Ex. SJ-D). This regular monthly billing statement, dating from months before the TPP or loan modification, says nothing at all about whether the late charges were waived in the loan modification. Plaintiffs do not cite to anything in the record where they requested an "accounting."

amount to be reaffirmed as $518,181.33. (*Id.*). Within the bankruptcy proceeding the Heymans attempted to negotiate the reaffirmation agreement, by reducing the amount due on the loan to $341,000 and reducing the interest rate to 2%. (DSMF ¶24).[21]

Citi did not agree to the Heymans' proposed revised terms; the Bankruptcy Court did not approve the reaffirmation agreement; and the trustee abandoned the property. (DSMF ¶25; DE 104-4, Ex. G at 140; *In re Heyman*, No. 13-32151-NLW (Bankr. D.N.J. Oct. 9, 2013) (DE 24); PSJBr at 12). No objection was filed to the notice of abandonment. *In re Heyman*, No. 13-32151-NLW (Bankr. D.N.J. Oct. 9, 2013) (DE 28). The Heymans received a discharge in bankruptcy on January 14, 2014. (DSMF ¶25; *In re Heyman*, No. 13-32151-NLW (Bankr. D.N.J. Oct. 9, 2013) (DE 27)).[22]

In July of 2014, the Heymans moved out of the mortgaged Pennington Avenue Property and took up residence in Lakewood, New Jersey. (DSMF ¶26; PRS ¶26). The Heymans have used the Pennington Avenue Property as a rental, income-generating property. Aside from the short-lived TPP/HAMP period in

---

[21] In response to this factual allegation, the Heymans assert, without citation to the record, "Plaintiffs admit prior counsel attempted to negotiate the reaffirmation of the loan via the agreement sent by CMI, to the promised 2% rate and reported secured modified balance of $341,000. CMI failed to appear or oppose and the property was abandoned by the trustee." (PRS ¶24). Citi's factual assertion in paragraph 24 of its Statement of Material Facts is deemed admitted because the Heymans fail to support their denials with a citation to the record. Fed. R. Civ. P. 56(e). In particular, the Heymans do not cite to anything in the record to establish that Citi's failed to appear or that this was the basis for the trustee's abandonment. *See In re Heyman*, No. 13-32151-NLW (Bankr. D.N.J. Oct. 9, 2013).

Despite asserting that the property was abandoned by the bankruptcy trustee in their summary judgment brief, the Heymans assert that the mortgage should be treated as a discharged debt in their opposition to the rent receiver motion. (PRRBr at 5-6).

[22] Rather than addressing the factual allegations in these paragraphs, the Heymans make a non-responsive legal argument. (PRS ¶25 ("The bankruptcy had the legal effect of a permanent injunction pursuant to 11 U.S.C §502, 11 U.S.C §524, 11 U.S.C. § 506 (a), which disallows 'in rem' and 'in personam' claims among others, assessment of pre petition debts, or amounts above the secured collateral, and disallows threats of repossession or harassment of the discharged debtor"); *see* Section. I.A. n.2, *supra.*

2013, they have made no payments on the mortgage loan since 2011. (DSMF ¶27).[23]

### F. Additional Facts Raised in Rent Receiver Motion

The original mortgage from GFI includes a "1-4 Family Rider," which contains a provision for the assignment of rents from borrowers. (DE 103-2, at 33-34, Ex. B). That provision provides as follows:

> **H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to paragraph 21 of the Security Instrument and (ii) Lender has given [] notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.
>
> If Lender gives notice of breach to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv)

---

[23]  Plaintiffs' responsive statement of facts admits that they have been using the property as a rental property, and further alleges the following:

> [T]he plaintiffs are not free to just pay any amount they want and Citi has offered only loan amounts that exceed the rental income by further offering a HAMP which is not available for the loan. Further, neither CMI nor 'US Bank' has any cognizable legal ownership of the property or GFI mortgage bankers Inc note as it "released" the mortgage lien from county records in April 28, 2014 see D.E 83 exhibits, nor does the GFI mortgage bankers Inc note show cmi's endorsement or that of US Bank trustee for cmalt remic as required by the Pooling and servicing agreement, And as a "negotiable instrument" under the New Jersey uniform commercial code "ucc." Thus neither CMI or US Bank" would be entitled to the rental income or property or make a claim for such.

(PRS ¶27).

unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

(DE 103-2, at 33, Ex. B). An assignment of rents "shall terminate when all the sums secured by the Security Instrument are paid in full." (*Id.*). Both Mr. and Mrs. Heyman signed this Rider. (DE 103-2, at 34).

The Rider was part of the original mortgage documents. The Heymans' Modification Agreement specifically incorporates those earlier terms:

That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

(Modification Agreement, § 4(F)).[24] Citi issued a notice of default on April 14, 2014. (DE 103-2, Ex. J, at 92).

Mr. Heyman could not remember the names of prior tenants or the rents they paid.[25] The current status is as follows. In October 2016, the Heymans

---

[24]     The Modification Agreement "amend[s] and supplement[s] (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the 'Loan Documents.'" (DE 104-3, at 79).

[25]     The Heymans rented both units to others prior to the current tenants but Mr. Heyman could not specifically identify them during his deposition. (DE 103-3, Ex. A, at 17:2-19, 18:7-23, 21:6-17). Mr. Heyman indicated that he had never lived in the

began renting one of the family units to a "Ms. Silverberg" for $1,475 per month. (DE 103-3, Ex. A, at 19:20-20:6). The Heymans began renting the other family unit to an individual named Yosef Mandelbaum, beginning in or about August 2015, for $1,400 per month. (DE 103-3, Ex. A, at 12:2-12, 16:8-14, 22:9-15). Both units remain occupied. Mr. Heyman testified that he has destroyed copies of the leases, has not kept copies of the checks, and has deposited the rental checks into his personal bank account. (DE 103-3, Ex. A, at 15:24-17:1). Citi has paid the property taxes since the Heymans defaulted in 2013. (DE 103-3, Ex. B, at 291:16-293:25).

On February 21, 2018, Citi issued a second notice of default. (DE 103-2, Ex. K, at 95). Also on February 21, 2018, Citi, through its counsel, requested that the Heymans (1) produce copies of all leases for any tenants currently in the mortgaged property; (2) confirm whether the Heymans would consent to the appointment of a rent receiver; (3) provide an accounting of all rental income since September of 2013; and (4) indicate whether the Heymans would escrow any rental income pending a decision on the rent receiver motion. (DE 103-3, at 24-25, Ex. C).

On March 12, 2018, the Heymans' counsel indicated that the Heymans would not consent to a rent receiver and have not provided copies of the subject leases or any further information regarding the tenants or an accounting. (DE 103-3, Vellutato Dec., at ¶ 5). Citi claims that this has impeded its ability to provide the tenants notice as required under the Rider.

### G. Procedural History

The Heymans, represented by prior counsel, filed their initial complaint on March 14, 2014. (DE 1). After motion practice and multiple dismissals, the Court accepted the Heymans' Second Amended Complaint, which was filed on September 26, 2016. (DE 39).

---

downstairs unit and had used it as a rental from 2002 to 2011. (DE 103-3, Ex. A at 24:12-25).

Following discovery, Citi filed this motion for the appointment of a rent receiver and a motion for summary judgment on October 26, 2018. (DE 103, 104). Citi's motion for summary judgment seeks dismissal of the SAC in its entirety. Citi's rent receiver motion seeks to assign all rental income generated from the mortgaged property to Citi, or, alternatively, to appoint a rent receiver to collect rents, make the necessary tax payments for the mortgaged property, and to hold any excess monies in trust for the protection of the mortgagee's interest in the Property. (DRRBr at 8-9).

On November 15, 2018, the Heymans, without seeking leave, belatedly filed a motion to strike Citi's answer for purported discovery violations. (DE 102, 107). The motion was filed almost twenty days after the Court-ordered deadlines for such motions. (DE 102). The Court nonetheless accepted the Heymans' filing. (DE 109).

On November 27, 2018, the Heymans filed their opposition to Citi's motion for summary judgment. (DE 110). The opposition was, again, untimely and filed without leave. (DE 102, 112). However, the Court accepted the untimely opposition. (DE 114).

On Defendant 11, 2018, the Heymans filed their opposition to Citi's rent receiver motion, which was, yet again, untimely and filed without leave. (DE 115, 116). The Court accepted the Heymans' filing. (DE 118).

On January 2, 2019, Citi filed its reply for its summary judgment and rent receiver motions. (DE 120-122).

On March 6, 2019, the Court denied the Heymans' motion to strike Citi's answer. (DE 123-124).

## IV. Summary Judgment Motion

The Heymans essentially allege that Citi "misled" them into a loan modification under HAMP and offered a modification that "did not comply or conform with HAMP guidelines and material promises made by [Citi.]" (PSJBr at 1).

### A. Applicable Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 47No7 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B. Pamela Farmer's Declaration

As a threshold issue, the Heymans argue that the Court should disregard the declaration of Pamela Farmer, Citi's Assistant Vice President, Office of Legal Support, and attached exhibits. (PSJBr at 2-4). The Heymans raise two principal objections: that Farmer lacks personal knowledge, and that the exhibits are not properly admissible as business records. I find that the declaration meets the requirements of Rule 56 and may be considered.

On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Federal Rule of Civil Procedure 56(c)(4) sets out three elements that a declaration in support of a summary judgment motion must meet. It "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." As for authentication, the proponent has an "incredibly 'slight' burden, which may be satisfied by simply producing evidence sufficient to support a finding that the item is what the proponent claims it is." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 330 (3d Cir. 2014) (citing Fed. R. Evid. 901(a)). "Fed. R. Evid. 901 allows authentication to be 'satisfied by evidence sufficient to support a finding that the matter in question is what it proponent claims,' which may be accomplished by the testimony of a witness with knowledge." *Cordance Corp. v. Amazon.com, Inc.*, 639 F. Supp. 2d 406, 432 (D. Del. 2009).

Recent amendments to Rule 56 have moved away from requiring litigants to meet trial-like evidentiary foundation requirements at the summary judgment stage. Prior to the 2010 amendments, "Rule 56 required . . . documents . . . to be authenticated by and attached to an affidavit that met the requirements of Rule 56 and the affiant had to be a person through whom the exhibits could be admitted into evidence." *In re LTC Holdings, Inc.*, 2019 Bankr. LEXIS 277, *6 n.13 (Bankr. D. Del. Feb. 4, 2019). The rule makers, however, omitted these specific requirements with the 2010 amendments. *Id.*

Rule 56(c)(4)'s newly-added "would be admissible" language is in accord with this Circuit's requirements for summary judgment. *Id.*; *see also FOP v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016). At this stage, the party proffering the declaration only need to show that the facts presented are "capable of being admissible at trial" for them to be considered for summary judgment. *Id.*; *see also Kuibyshevnefteorgsynthez v. Model*, 1995 U.S. Dist. LEXIS 1896, at *30 (D.N.J. Feb. 6, 1995) (providing that Court may "consider

unauthenticated documentary evidence," on summary judgment, "if there were reason to believe it could be authenticated later."). In other words, when evidence is not presented in an admissible form in the context of a motion for summary judgment, but it may be presented in an admissible form at trial, a court may still consider that evidence.

Personal knowledge for purposes of Federal Rule of Evidence 602 "may consist of what the witness thinks he knows from personal perception," and only requires that the witness "who testifies to a fact . . . actually observed the fact." More to the point here, personal knowledge of business records may be gained by review of such records by an appropriate person. *See In re Sia*, 2015 U.S. Dist. LEXIS 172126, at *21 (D.N.J. Dec. 28, 2015) ("The court did not abuse its discretion in holding that 'personal knowledge' may be gained through review of the relevant records relating to the case.") (citing *Serfess v. Equifax Credit Info. Servs., LLC*, 2015 WL 5123735, at *2 (D.N.J. Sept. 1, 2015) (denying motion to strike declaration of employee who attested to facts "based on [her] personal knowledge gained through [her] employment with Equifax and/or [her] review of Equifax's business records"); *Byrd v. Merrill Lynch*, 2011 WL 2680572, at *6 (D.N.J. July 8, 2011), *aff'd*, 479 F. App'x 444 (3d Cir. 2012) (permitting declaration of employee who was not personally present); *see also Crumpler v. Midland Credit Mgmt., Inc.*, 2013 U.S. Dist. LEXIS 174589, at *5 (E.D. Pa. Dec. 13, 2013) (declining to strike declaration where declarant attested that he reviewed business records and noting that declarant did not need independently obtained knowledge of attested-to business practices).

Farmer's declaration meets the requirements of Rule 56(c)(4). As set forth in Farmer's declaration, her knowledge is based upon a review of Citi's books and records, which are kept in the regular course of business. (DE 104-3, ¶1). Farmer's declaration further attests that the attached exhibits are "true and accurate" copies. (DE 104-3, ¶¶4-6, 8-9, 11-13, 15). Personal knowledge may be based on a review of documents, as attested to by Farmer in this case. That

is all that is required at this stage. Accordingly, the Heymans' request that the Court disregard Farmer's affidavit and accompanying exhibits is denied.[26]

### C. Citi's Authority to Modify the Loan

I move on to an issue, not specific to any one claim, that runs through many of the Heymans' arguments. Throughout their briefing and responses to Citi's statement of undisputed material facts, the Heymans seem to challenge the validity of the mortgage assignments. (*See* PRS ¶ 3 (denying that mortgage was assigned from GFI to Citi "because this assignment appears fraudulent."); PRS ¶4 (denying that Citi assigned mortgage to U.S. Bank National Association as Trustee "because Citi could not assign the note that it did not own."); PRS ¶18 ("since neither Citi nor US Trust can prove they own the note, it is difficult to say whether the plaintiffs are in default."); PSJBr at 4 ("The very foundation of [Citi's] claim of ownership or servicer status is unproven"); PSJBr at 5 ("[Citi] cannot prove standing or that it legally owns or was legally 'delegated' to service the GFI note the Heymans were obligated to pay."); PSJBr at 14-15 (alleging that Citi committed "fraud upon the court by claiming and asserting it legally owns or owned the Heymans' loan."); PSJBr at 31 ("Citi . . . recorded a fake assignment to a US Bank Trust. Because Citi does not now and never has legally owned the plaintiffs' loan, these remarks are false."); PSJBr at 32 ("Citi knew that it had no claim on the plaintiffs' property yet it published an ownership interest.")). The Heymans recast this argument as a standing issue in their opposition to Citi's rent receiver motion. (PRRBr at 8-10).

To all of this, there are answers both factual and legal.

---

[26]    Apparently only selective sticklers for the Rules of Evidence, the Heymans cite an online article, from which they suggest that Citi must have created fraudulent documents in their case. (PSJBr at 4 (citing Kathryn Vasel, *Citi mortgage units fined $28.8 million*, CNN (Jan. 23, 2017, 5:03 PM), https://money.cnn.com/2017/01/23/pf/cfpb-citi-mortgage-fined/index.html)). The article relates that the CFPB fined Citi's mortgage units for requiring excessive paperwork from some homeowners seeking foreclosure relief. From this, the Heymans argue that the loan documents involved in their transaction are "fraudulent." Evidentiary objections aside, this article says nothing of the kind, and is insufficient to raise a factual inference cognizable under Rule 56 and Local Rule 56.1.

First, the evidence does not create an issue of fact as to the fact or validity of the GFI/Citi assignment. Mere say-so by attorneys, no matter how often repeated in briefs, does not suffice to raise a factual issue on summary judgment. The assignments are in evidence and are regular on their face. Calling them "fraudulent" does not create a genuine, material issue of fact; to defeat summary judgment, a party must point to a conflict in the evidence.

The facts surrounding the assignment are discussed in more detail above. In brief, GFI, the original mortgagee in 2006, immediately and unconditionally assigned the mortgage to Citi; Citi was the only holder of the mortgage from 2006 until 2014.

On April 4, 2014, Citi assigned and conveyed the mortgage to U.S. Bank National Association as the trustee of "CMALT (CitiMortgage Alternative Loan Trust) REMIC Series 2006-A7 REMIC Pass-Through Certificates." (DE 104-3, at 39). In essence, the loan was pooled. Pursuant to a Pooling and Servicing Agreement (PSA) among Citicorp Mortgage Securities, Inc. as Depositor, CitiMortgage, Inc. as Servicer and Master Servicer, and U.S. Bank National Association as Trustee, Citi is the servicer of the loans in CMALT. (DE 103-2, at 54-61). U.S. Bank National Association also gave Citi a limited Power of Attorney (dated September 20, 2013) over CMALT. (DE 103-2 at 63).

In short, Citi was the exclusive holder of the mortgage until 2014, when the loan was pooled into CMALT. Thereafter, Citi was the servicer, and as servicer, had the right to modify the loan or to seek default.

I add that the Heymans have made mortgage payments to Citi, have dealt extensively with Citi in connection with the HAMP matter, and have listed Citi as a secured creditor in their bankruptcy. They have never alleged that their payments have not been credited, that they have been double-billed by competing putative mortgagees, or anything of the kind. They brought this action solely against Citi.

Second, to the extent that the Heymans may intend to assert a quiet-title claim, they cannot do so by throwing it into a brief. A plaintiff may file a quiet title action to determine the validity of any document, obligation, or deed

affecting any right, title, or interest in land. Such an action may be filed to resolve whether a putative assignee of an otherwise valid mortgage properly holds the mortgage. *See* N.J. Stat. Ann. §2A:62-1; *Suser v. Wachovia Mortg., FSB*, 433 N.J. Super. 317, 324-25 (App. Div. 2013); *see also Deutsche Bank Tr. Co. Ams. v. Angeles*, 428 N.J. Super. 315, 318 (App. Div. 2012) (stating that standing to enforce obligation under mortgage is conferred by "either possession of the note or an assignment of the mortgage") (citation omitted).[27]

The SAC does not contain a quiet-title cause of action. The closest fit is Count VII (Slander of Title), but that is not a claim that there never was an assignment; it alleges that Citi inflated the value of its lien. Opposition to

---

[27]      An action to quiet title empowers "a person, who is in peaceable possession of realty as an owner, a means to compel any other person, who asserts a hostile right or claim, or who is reputed to hold such a right or claim, to come forward and either disclaim or show his right or claim, and submit it to judicial determination." *Schiano v. MBNA*, 2013 WL 2452681, at * 26 (D.N.J. Feb. 11, 2013). "[I]t is a settled rule that in an action to quiet title the plaintiffs must rely upon the strength of their own title and not upon the weakness of that of the defendants." *Oliver v. Bank of Am., N.A.*, 2014 WL 1429605, at *2 (D.N.J. Apr. 14, 2014) (quotation and citation omitted).

The Heymans do not adequately allege the strength of their own title. The Heymans do not dispute that they executed the mortgage and promissory note. The Heymans do not dispute that they defaulted on their mortgage and therefore are "indebted to the rightful owner of this lien." *Dudley v. Meyers*, 422 F.2d 1389, 1394-95 (3d Cir. 1970); *see also Jacobs v. Fannie Mae*, 2013 WL 3196933, at *2 (App. Div. June 26, 2013) ("[Plaintiff] acknowledges that he obtained a loan secured by the mortgage and note in question and does not allege that he paid off the note and extinguished the mortgage lien."). Based on these facts, the Heymans do not have some superior title that would defeat that of Citi.

Additionally, "Courts in this jurisdiction have repeatedly found mortgagors do not have standing to challenge the assignment of their mortgages because they are not parties to or third-party beneficiaries of the assignment." *English v. Fed. Nat'l Mortg. Ass'n*, 2017 WL 1084515, at *3 (D.N.J. Mar. 21, 2017) (collecting cases). This is true even when a mortgagor brings an action to quiet title. *See Perez v. JPMorgan Chase Bank, N.A.*, 2016 WL 816752, at *7 (D.N.J. Feb. 29, 2016) (holding that plaintiff's quiet title claim would "fail[] for lack of standing" to the extent it asserted that "[d]efendants . . . improperly assigned the Note and Mortgage." (citations omitted)). "Merely alleging . . . the loan documents are invalid or improperly assigned does not state a claim for an action to quiet title." *Andujar v. Deutsche Bank Nat. Trust Co.*, 2015 WL 4094637, at *4 (D.N.J. July 7, 2015) (citation and internal quotation marks omitted). The Heymans have not alleged or argued that they are a party to, or third-party beneficiary of, the assignments at issue.

32

summary judgment is not the appropriate vehicle to insert new claims. *See Bey v. Daimler Chrysler Servs. of N. Am.*, 2006 WL 361385, at *11 (D.N.J. Feb. 15, 2006) ("[C]laims [that] were not alleged in the complaint . . . cannot be raised for the first time in opposition to a motion for summary judgment."). Because the Heymans did not plead this claim in the SAC, I will not consider it on summary judgment. *Anderson v. DSM N.V.*, 589 F. Supp. 2d 528, 534 n.5 (D.N.J. 2008) (declining to consider new breach of contract claim on summary judgment when plaintiff failed to plead that "particular claim" in the complaint).

The Heymans seem to dispute whether Citi was permitted, as the servicer of the loan, to enter into a loan modification with the Heymans. (PSJBr at 2, 5). In particular, the Heymans argue that Citi was not delegated the authority to "collect" payments or enter into a loan modification until September 20, 2013, when a power of attorney ("POA") was executed between Citi and U.S. Bank National Association. (PSJBr at 5). That POA was signed after the Heymans agreed to the Modification Agreement. (PSJBr at 6).

Citi, however, has demonstrated that it was not merely a servicer, but was and is the actual holder of the mortgage by assignment from GFI from 2006 until 2014, a period that encompasses the dates of the loan modification. (Farmer Decl. Ex. C; DE 83, at 7). The loan modification was executed in 2013, while Citi was the sole assignee. Citi remained the sole assignee of the mortgage until April 4, 2014, when it reassigned the mortgage to US Bank National Association as Trustee, but remained the servicer. (*See* p. 31, *supra*; DSMF ¶4; Farmer Decl. Ex. D). The POA, which was executed after the Modification Agreement, but before the assignment to US Bank National Association as trustee, does not undercut Citi's authority, as mortgagee, to offer a modification in August of 2013. (*See* DE 83, at 7). The POA, whatever its legal effect, has no bearing on Citi's authority to enter into that agreement with the Heymans.

### D. Breach of Contract

Turning to the individual claims, Citi seeks summary judgment on the Heymans' claim of breach of contract. (DSJBr at 28-30). The SAC is not entirely clear, but this claim seems to rest on either the April 30 telephone call (as an oral contract) or the TPP Letter itself (as a written contract):

> This cause of action includes the following elements: (1) the existence of a binding contract (here, the promise to provide a proper loan modification that met the terms of HAMP); (2) that the nonbreaching party performed its contractual obligations; (here, by fulfilling the trial payment plan obligations which defendant required) (3) the other party failed to fulfill its contractual obligations without legal excuse (here, by failing to offer a HAMP type mortgage loan modification); and (4) the nonbreaching party suffered damages as a result of the breach. Here, the plaintiffs suffered by not being able to afford the payments and having to file for bankruptcy.

(SAC ¶61).

Citi moves for summary judgment on several bases. First, Citi contends that the TPP did not create an enforceable contract between the parties and is barred by the statute of frauds. Second, even if the TPP did create a binding contract, Citi argues that the Heymans cannot demonstrate breach or damages.

The Heymans do not directly address Citi's arguments regarding the TPP agreement. The only argument that comes close to the issue occurs in a footnote that principally contends that Citi does not have a "cognizable claim to the Heymans' loan, note, or property." (PSJBr at 26 n.12). That footnote also suggests that the TPP created a binding contract, which the Heymans accepted by tendering TPP payments. (*See id.*).

The Heymans' argument is cursory: "[T]he contract between the parties began with the TPP for the HAMP modification. Because Citi called the loan modification a HAMP modification, the plaintiffs had a right to expect that the modification Citi offered would be compliant with HAMP. However, it was not." (PSJBr at 26-27). The Heymans do not specify whether their breach of contract claim is based on the TPP or the permanent loan modification agreement, instead pointing to, what can be best described as, a course of dealing. The

Heymans do not concretely argue that Citi breached the terms of either agreement, or identify the relevant contractual terms or nature of any such breach.

The Heymans assert that Citi's witness "insisted that the modification loan complied with HAMP." (PSJBr at 29). The implication seems to be the TPP is the agreement that was allegedly breached.

The Heymans, however, then fail to point to any provision of HAMP that was violated or state how the TPP was breached by that violation. (PSJBr at 32).[28] They do not seem to be arguing that the permanent Modification Agreement was breached, nor do they argue (if this is what they meant) that the April 30, 2013 phone call with a Citi representative created a binding oral contract. (*See* PSJBr at 26-29).

I think that the TPP has contractual status, but only to this extent: Citi undertook to offer a HAMP-compliant loan modification *if* the Heymans complied with the conditions of the TPP. Once that precondition occurred, Citi would offer a loan modification, which the Heymans were free to accept or not. (As it happened, the Heymans, represented by counsel, signed the loan modification.) The TPP did not, however, commit Citi to any particular terms. Despite the unclear presentation, I have attempted to extract from the briefs and pleadings the Heymans' claims that the modification agreement violated

---

[28]     Typically, "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived." *John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (citing *Commonwealth of Pa. v. HHS*, 101 F.3d 939, 945 (3d Cir. 1996)); *see also Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("a passing reference to an issue ... will not suffice to bring that issue before this court."); *Kadetsky v. Egg Harbor Twp. Bd. of Educ.*, 82 F. Supp. 2d 327, 334 n.5 (D.N.J. 2000) (finding "casual reference" to a claim results in waiver). "When an issue is not pursued in the argument section of the brief, the appellant has abandoned and waived that issue on appeal." *Travitz v. Ne. Dep't ILGWU Health & Welfare Fund*, 13 F.3d 704, 711 (3d Cir. 1994) (citations omitted); *see also Glenwright v. Carbondale Nursing Home, Inc.*, 2017 U.S. Dist. LEXIS 41805, at *29 n.3 (M.D. Pa. Mar. 23, 2017) ("[T]he parties have failed to properly address this issue and rely solely on sparse arguments in footnotes. This renders the court unable to 'make an informed ruling' on the issue.").

the TPP agreement because it was not HAMP-compliant. (*See* Section D.ii, *infra*.)

### i. Enforceability of TPP Agreement

Citi argues that the TPP agreement was conditional in nature and simply the "first step" in the modification process. (DSJBr at 29-30). Because the TPP Letter did not contain any material terms of the permanent modification and was not executed or signed by the Heymans, Citi contends that the TPP is not enforceable. (*Id.*).

The Heymans' breach of contract claim presupposes the existence of an enforceable contract. The basic features of a contract include offer, acceptance, consideration, and performance by both parties. *Shelton v. Restaurant.com, Inc.*, 214 N.J. 419, 439 (2013) (citations omitted). "It is well settled that parties may effectively bind themselves by an informal memorandum where they agree upon the essential terms of the contract and intend to be bound by the memorandum, even though they contemplate the execution of a more formal document." *Berg Agency v. Sleepworld-Willingboro, Inc.*, 136 N.J. Super. 369, 373-74 (App. Div. 1975) (citations omitted); *see J&P Int'l Enter. v. Cancer Treatment Servs. Int'l, L.P.*, 2010 U.S. Dist. LEXIS 85448, at *20-21 (D.N.J. Aug. 19, 2010) (noting that the determination of whether parties intended to be bound turns on the "document itself," the "underlying facts relating to the negotiations," prior dealings between the parties, industry practice, and "whether performance that was agreed to by the parties was undertaken."); *see also* Restatement (Second) of Contracts § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.").

Contracts can be either bilateral or unilateral. *Miller v. Bank of Am. Home Loan Servicing, L.P.*, 439 N.J. Super. 540, 549 (App. Div. 2015); *Arias v. Elite Mortg. Grp., Inc.*, 439 N.J. Super. 273, 276 (App. Div. 2015); *see also Wigod*, 673 F.3d at 562 (concluding that TPP agreement was "a unilateral offer to

modify Wigod's loan conditioned on her compliance with the stated terms of the bargain."). Some courts have concluded that TPPs are unilateral contracts in which the lender makes an offer (to offer a permanent modification) which calls for the borrower to accept by rendering performance (by timely making TPP payments and providing supporting financial documentation). *See Miller*, 439 N.J. Super. at 549; *Arias*, 439 N.J. Super. at 276.

Other courts, after reviewing the language in a TPP, have found that it is simply one step in the application process towards a permanent modification. Therefore, those courts have concluded, the TPP cannot form the basis of a breach of contract claim because it contains no guarantee of a permanent modification. *See, e.g., Slimm v. Bank of Am. Corp.*, 2013 U.S. Dist. LEXIS 62849, at 11 (D.N.J. May 2, 2013); *Stolba v. Wells Fargo*, 2011 WL 3444078, at *3 (D.N.J. Aug. 8, 2011); *see also Marra v. Wells Fargo Bank, N.A.*, 2013 WL 4607483, at *3 (App. Div. Aug. 30, 2013) (concluding that TPP "was the first step of a two-step process," and did not create contract where TPP stated that "[t]his [p]lan will not take effect unless and until both [plaintiff] and [Wells Fargo] sign it," and Wells Fargo did not sign TPP).

In *Slimm*, relied on by Citi, the court held that "[i]t has been previously recognized that TPPs are explicitly not enforceable offers for loan modifications . . . because TPPs serve as precursors to final loan modifications, and therefore are largely conditional in nature." 2013 WL 1867035, at *11 (internal citations omitted). However, I find *Slimm* to be distinguishable — the court in *Slimm* only addressed whether the TPP created an enforceable contract that *required* defendant to permanently modify the plaintiff's loan. Notably, *Slimm* did not address the more limited claim that the TPP was a commitment *to offer* a compliant loan modification agreement to the plaintiff, which the plaintiff could then accept or reject.

Similarly, in *Stolba*, 2011 WL 3444078, at *3, the court found that the plaintiffs could not plausibly state a breach of contract claim based upon their TPP. The court, however, based this determination on the language of the TPP

documents at issue, which stressed that a borrower "*may* qualify for a HAMP TPP" and that a borrower would be offered a permanent loan modification "*If* we are able to modify your loan under the terms of the program." *Stolba*, 2011 WL 3444078, at *3 (quotations and citations omitted; emphasis in original).

Courts directly addressing the narrower issue have held that a TPP creates an enforceable agreement to at least offer a permanent loan modification. *Bukowski v. Wells Fargo Bank, N.A.*, 2018 WL 6584119, *4 (3d Cir. Dec. 13, 2018) ("It is well establishing in out Circuit and elsewhere that TPPs operate as valid contracts." (citing *Giordano v. Saxon Mortg. Servs.*, 2014 U.S. Dist. LEXIS 137703, at *16 (D.N.J. Sep. 29, 2014) ("Courts analyzing similar TPPs and allegations have held the TPP is an enforceable contract." (collecting cases)))); *Wigod*, 673 F.3d at 563 (holding that TPP was an offer to provide permanent modification agreement if borrower fulfilled necessary conditions);[29] *Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 813 (E.D. Pa. 2014) (finding that TPP agreement constituted a binding contract "[g]iven the affirmative promise by Defendant to provide Plaintiff with an Modification Agreement upon satisfaction of her obligations."); *Laughlin*, 2014 WL 2602260, at *7 (holding that defendant's "assertion that the TPP did not obligate [defendant] to provide Plaintiffs with a permanent loan modification as a matter of law falls short"); *Cave v. Saxon Mortgage Servs., Inc.*, 2012 WL 1957588, *6 (E.D. Pa. May 30, 2012) (holding that TPP was contract obligating defendant to either offer modification agreement or send plaintiffs a written denial).

I find persuasive the reasoning of these second line of cases, which have held that a TPP is a unilateral offer to offer a permanent modification, if certain conditions are met by the borrower. The language of Citi's TPP Letter creates at least an issue of fact as to whether that is so.

---

[29]     The court in *Wigod* rejected the lender's argument that there was no consideration underlying the TPP agreement because the debtor was merely making a partial payment of a debt she already owed. 673 F.2d at 564. The court pointed out that in entering into the TPP agreement, the debtor agreed to provide additional financial information and to attend debt counseling if asked to do so, which met the minimal requirements of consideration. *Id.*

Specifically, the TPP Letter states that "After all trial period payments are timely made and you have submitted all the required documents, *your mortgage will be permanently modified*." (TPP Letter (emphasis added)); *see Fennimore v. Bank of Am., N.A.*, 2015 U.S. Dist. LEXIS 153980, at *19 (E.D. Pa. Nov. 12, 2015) (finding TPP enforceable contract where TPP promised "[i]f you complete the trial period successfully we will offer you a modification of your Loan."). The TPP Letter further states that "To qualify for a permanent modification, you must make the following trial payments in a timely manner." (TPP Letter, at 1). In the FAQ section, the TPP Letter is identified as an "offer" and represents that "Once you [the Heymans] make all of your trial payments on time, we [Citi] will send you a modification agreement detailing the terms of the modified loan." (TPP Letter, at 2).

This language suggests that the TPP Letter is an offer to make an offer—*i.e.*, a commitment to offer a permanent loan modification agreement provided certain conditions are fulfilled in the trial period. The Heymans accepted that offer by making timely TPP payments and submitting "all the required documents." To be sure, the letter states that this is merely the "first step toward qualifying for more affordable mortgage payments," which might weigh against a finding of contractual status. Still, such language will not support summary judgment for Citi where, as here, other portions of the letter suggest an enforceable unilateral contract.

Turning to Citi's statute of frauds argument, New Jersey law requires a writing signed by the lender if a loan exceeds $100,000. N.J. Stat. Ann. §§ 25:1-5(f), (g); *see United States Bank Nat'l Ass'n v. Chimento*, 2019 N.J. Super. Unpub. LEXIS 477, at *3-4 (App. Div. Mar. 4, 2019). That requirement of a writing applies to a loan modification. *Id.* (citing *Nat'l Cmty. Bank v. G.L.T. Indus.*, 276 N.J. Super. 1, 4 (App. Div. 1994)).

As noted above, however, the TPP is not itself a loan modification contract; it is a contract to *offer* a modification agreement, should the Heymans complete the trial period successfully. *See Fennimore*, 2015 U.S. Dist. LEXIS

153980, at *28 (concluding that statute of frauds did not bar breach of TPP contract claim because "the TPP is not a loan modification contract; it is merely a contract for Defendants to provide Fennimore with a modification agreement if she completes her trial period successfully."); *see also Nickerson-Reti v. Bank of Am., N.A.,* 2018 U.S. Dist. LEXIS 83037, at *28 (D. Mass. May 17, 2018) ("[T]o the extent plaintiff contends that she had a fully enforceable, permanent modification of her loan and mortgage, the statute of frauds bars that claim. However, the statute of frauds does not apply to the TPP, which is not an agreement to modify the loan or the mortgage."); *Aragao v. Mortg. Elec. Registration Sys., Inc.,* 22 F. Supp. 3d 133, 139 n.6 (D. Mass. 2014) ("[B]ecause the alleged contract concerns a modification to the mortgage payment terms, rather than to the underlying interest in the land, the Massachusetts statute of frauds does not bar this Court from considering the existence and potential breach of a non-written contract.").

Additionally, the New Jersey Statute of Frauds requires only the signature of the "party to be charged." N.J. Stat. Ann. § 25:1-5. The New Jersey Uniform Electronic Transactions Act, N.J. Stat. Ann. §§ 12A:12-1 to -26, provides that an electronic signature satisfies any law requiring a signature. N.J. Stat. Ann. § 12A:12-7. The TPP Letter contains an electronic signature from Patricia Ruiz, on behalf of Citi, the "party to be charged." Accordingly, the Statute of Frauds would not bar the Heymans' breach of TPP contract claim, even if the TPP Letter was subject to the Statute.[30] *Cf. Fennimore,* 2015 U.S.

---

[30]     The Heymans have not alleged in their SAC that the April 30, 2014 telephone conversation with a Citi representative created a binding contract, nor do they raise it in the argument section of their brief. The Statute of Frauds would, of course, bar a breach of contract claim that alleged that Citi offered, and the Heymans accepted, a modified 2% interest rate based on the April 30, 2013 telephone conversation. (DE 110-3, at 81, Pltfs.'s Ex. C). To the extent that the Heymans contend that they had a fully enforceable, permanent modification of their loan and mortgage with a two-percent interest rate based on Citi's oral representation, the Statute of Frauds bars that claim. At any rate, this term would have been authoritatively superseded by the TPP Agreement and the executed Loan modification agreement.

Dist. LEXIS 153980, at *29 (finding electronic signature of lender's employee satisfied Pennsylvania's Statute of Frauds).

### ii. Merits of Contract Claim

The TPP, then, is properly regarded as a contract. A party alleging a breach of contract must establish (1) the existence of a contract; (2) a breach of that contract; (3) damages flowing from the breach; and (4) that the complaining party performed its own contractual duties. *See Video Pipeline Inc. v. Buena Vista Home Entm't, Inc.*, 210 F. Supp. 2d 552, 561 (D.N.J. 2002) (citing *Pub. Serv. Enter. Group, Inc. v. Phila. Elec. Co.*, 722 F. Supp. 184, 219 (D.N.J. 1989)). Citi argues that the breach of contract claim fails because the Heymans cannot demonstrate breach or damages. (DSJBr at 30-31).

#### a. HAMP guidelines as incorporated contractual terms

The Heymans contend that the TPP agreement promised a HAMP-compliant permanent loan modification, provided that the Heymans met their obligations under the TPP.[31] (PSJBr at 28-29). In essence, the Heymans would incorporate the federal HAMP guidelines as terms of the (future) Modification Agreement. Accordingly, the failure to provide a Modification Agreement that complies with HAMP guidelines would be a breach of the TPP.

Whether a contract term is "clear or ambiguous is . . . a question of law." *Kaufman v. Provident Life and Cas. Ins. Co.*, 828 F. Supp. 275, 282 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir.1993). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *Id.* at 283. To determine the meaning of the terms of an agreement, the terms of the contract must be given their plain and ordinary meaning. *Id.* A "court should not torture the language of [a contract] to create ambiguity." *Stiefel v. Bayly, Martin & Fay, Inc.*, 242 N.J. Super. 643, 651 (1990). "In addition to the express terms of a contract, terms may be implied in fact and enforceable [b]y interpretation of a promisor's word and conduct in light of the surrounding circumstances." *Zelnick v. Morristown-Beard Sch.*, 445

---

31    Citi does not dispute that the Heymans met their obligations under the TPP.

N.J. Super. 250, 260 (Law Div. 2015) (quoting *Wanaque Borough Sewerage Auth. v. Twp. of W. Milford*, 144 N.J. 564, 574 (1996)).

Citi does not really dispute that that the TPP contemplated that the loan modification agreement to be offered in the future would be HAMP-compliant.[32] For example, the TPP Letter to the Heymans states that the trial period plan was being offered "under the Home Affordable Modification Program." (TPP Letter, at 1). The bottom of the letter further states that the "Making Home Affordable program was created to help millions of homeowners of homeowners refinance or modify their mortgages. As part of this program, we — your mortgage servicer — and the Federal Government are working to offer you options to help you stay in your home."

At this summary judgment stage, the Heymans are entitled to the benefit of an interpretation that would incorporate HAMP regulations as implied terms in the contract. *See Bukowski*, 2018 WL 6584119, at *4 ("Here, the Bukowskis allege that Wells Fargo issued them a TPP that promised to offer a permanent HAMP modification that complied with HAMP's guidelines. After receiving the Bukowskis' timely payments, Wells Fargo issued them a HAMP modification that allegedly contravened HAMP's guidelines. These allegations are sufficient to state a plausible breach of contract claim."); *Patrick v. CitiMortgage, Inc.*, 2014 Bankr. LEXIS 5115, at *32 (Bankr. N.D. Ohio Dec. 22, 2014) (holding that incorporation of HAMP into a validly executed contract may give rise to liability under state law breach of contract theory); *see also Wigod*, 673 F.3d at

---

[32]    As to incorporation by reference, New Jersey contract law requires that an extrinsic document "be described in such terms that its identity may be ascertained beyond doubt and the party to be bound by the terms must have had 'knowledge of and assented to the incorporated terms." *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 410 N.J. Super. 510, 533 (App. Div. 2009) (quoting 4 Williston on Contracts § 30:25 (Lord ed. 1999)).

Every contract must be examined "in light of the common usage and custom and consider[ing] the circumstances surrounding its execution." *Pacifico v. Pacifico*, 190 N.J. 258, 267 (2007); *see also Marchak v. Claridge Commons, Inc.*, 134 N.J. 275, 282 (1993) ("When reading a contract, our goal is to discover the intention of the parties. Generally, we consider the contractual terms, the surrounding circumstances, and the purpose of the contract.").

565 (noting that "HAMP guidelines unquestionably informed the reasonable expectations of the parties" that any permanent modification agreement offered after completion of the trial period would comply with HAMP.).

### b. Claims that Modification was not HAMP-compliant

This section of the Heymans' brief reargues the point that that Citi (or its Trustee) were not authorized to offer a permanent loan modification because the assumption and modification provisions of the PSA did not permit it. (PSJBr at 29). I have already rejected that argument. As noted above, the cited provision applies if a mortgagor, like the Heymans, transfers the mortgaged property to a non-signatory of the loan. That provision is plainly inapplicable to the Heymans' loan modification under HAMP. See n.18, *supra.*

The facts section of the Heymans' brief, however, cites several HAMP Guidelines that could be applicable to their breach of contract claim: (1) the 5.25% interest rate violated an "interest rate cap" (PSJBr at 8 (citing Guidelines 6.3.1.2 and 9.3.6)); (2) Citi determined that the Heymans' gross income was $2,005.00, but the monthly payment was set at $3,438.76, which was more than 31% (PSJBr at 9 (citing Guideline 6.1.2)); and (3) Citi failed to waive late fees (PSJBr at 9 (citing Guidelines 9.3.2 and 6.3.1.1)). (*See* PSJBr at 18). I address these Guidelines in turn.

**Interest Rate Cap.** First, the Heymans contend that the 5.25% interest rate violates HAMP Guidelines 6.3.1.2 and 9.3.6. (PSJBr at 8); *see* Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages, Version 4.2 (May 1, 2013) (hereinafter "Guidelines").[33] Guideline 6.3.1.2, which is Step 2 in the waterfall method, makes clear that 2% is the interest rate

---

[33]     Citi reviewed the Heymans' loan modification under Version 4.2 of the HAMP Guidelines. (DE 110-3, at 56, Pltf.'s Ex. B). Neither party attached the guidelines to their briefing, however, the Guidelines are publicly available. *See* Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages, Version 4.2 (May 1, 2013), *available at* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_42.pdf.

"floor"; it does not mandate a 2% interest rate for all borrowers. Guidelines, at 106.[34]

Pointing to Guideline 9.3.6, the Heymans argue that 5.25% rate exceeded the Guidelines-mandated interest rate "cap." That capped rate is set in reference to the "Freddie Mac Primary Mortgage Market Survey (PMMS) Rate for 30-year fixed rate conforming loans, rounded to the nearest 0.125 percent, as of the date that the Modification Agreement is prepared." Guidelines, at 125. The PMMS Rate in August of 2013, when the Modification Agreement became effective, was approximately 4.5%. *See* Freddie Mac, "30-Year Fixed-Rate Mortgages Since 1971," *available at* www.freddiemac.com/pmms/pmms30.html.

In this respect, however, the Heymans misconstrue the import of the Interest Rate Cap Guideline. Guideline 6.3.1.2 provides insight on the implications of Guideline 9.3.6. This is not a simple cap on the rate that can apply. Rather, in the second step of the waterfall method, the servicer reduces the borrower's current interest rate in 0.125 percentage-point increments to "get as close as possible to the target monthly mortgage payment ratio." Guidelines, at 106. If the resulting interest rate is below "the Interest Rate Cap (as defined in Section 9.3.6)," this reduced rate is in effect for the first five years of the modified agreement. *Id.* Thereafter, the interest rate increases annually by one percent "until the interest rate reaches the Interest Rate Cap, at which time the rate will be fixed for the remaining loan term."

However, "[i]f the resulting rate exceeds the Interest Rate Cap, then that rate is the permanent rate." *Id.* The Guideline that governs Step 2 of the waterfall method explicitly recognizes that the interest rate may exceed the PMMS rate, provided that the servicer stays within the 31% ratio. Guidelines, at 106. (More about the 31% ratio in the paragraphs immediately following.) Therefore, Guideline 9.3.6 does not impose an absolute bar to an interest rate

---

[34]     I address the related fraud claim that the Heymans were misled into *thinking* the rate would be 2% in Section IV.G., *infra.*

above the PMMS Rate. The Heymans have failed to demonstrate a breach on this basis.

**31% Income Ratio**. The real heart of the Heymans' claim is therefore the argument that the overall monthly payment exceeded 31% of their income, in violation of HAMP guidelines. (PSJBr at 9). "A showing that CitiMortgage improperly calculated Debtor's mortgage payments under the Modification Agreement would satisfy the third element [breach], and any difference between the proper and improper payment would create damages." *In re Patrick*, 2015 Bankr. LEXIS 1407, at *11 (Bankr. N.D. Ohio Apr. 23, 2015), *adopted by* 2016 U.S. Dist. LEXIS 38739 (N.D. Ohio Mar. 24, 2016), *aff'd*, 676 Fed. App'x 573 (6th Cir. 2017).[35]

Various Guidelines refer to the "target monthly payment ratio" for a HAMP Tier 1 modification as 31% of the borrower's monthly gross income. Guidelines, at 70 (Guideline 1.1.2, "HAMP Tier 1 Eligibility Criteria" (providing that borrower is eligible for modification if monthly mortgage payment "is greater than 31 percent of the borrower's verified monthly gross income.")); 101 (Guideline 6.1, "Monthly Mortgage Payment Ratio"); 105 (Guideline 6.3.1, "HAMP Tier 1 Standard Modification Waterfall" (providing that "servicers must apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent")). Guideline 6.1.2, "Monthly Mortgage Payment," provides that the monthly mortgage payment ratio should take into account "the monthly payment of principal, interest, property taxes," and escrow shortage amounts.

---

[35]     "District courts in this circuit have routinely recognized these trial modification related injuries as cognizable breach of contract damages." *Block v. Seneca Mortg. Servicing*, 221 F. Supp. 3d 559, 577 (D.N.J. 2016); *Smith v. Saxon Mortg. Servs., Inc.*, 2013 WL 1915660, at *7 (E.D. Pa. May 9, 2013) (finding damages where plaintiff claimed "payment of increased interest, longer loan payoff times, higher princip[al] balances, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, [and] costs and expenses incurred to prevent or fight foreclosure."); *see also Wigod*, 673 F.3d at 575 (concluding plaintiff established pecuniary loss where she "incurred costs and fees, lost other opportunities to save her home [and] suffered a negative impact to her credit.").

The Modification Agreement here does not state the Heymans' gross income. (*See* Modification Agreement). The monthly payment under the TPP was calculated to be $3438, however; for that to fall within the guideline of 31% of monthly income, then the monthly income would have to have been at least $11,090.[36] And Citi's Servicer Case Resolution document did indeed report a monthly income figure of $11,090.17. (Pamela Decl. Ex. F) At oral argument, counsel for plaintiff acknowledged that her client was required to and did supply financial information to Citi so that it could perform the HAMP calculation. At the time of the TPP, Heyman was represented by counsel (current counsel's predecessor).

The Heymans point, however, to a discrepancy in Citi's documents. The TPP letter states in the "FAQ" section that "[y]our trial payment is approximately 31% of your total gross monthly income, which we determined to be $2,005.00 based upon the income documentation you provided." This, says Heyman, establishes that his income was $2,005 per month. (TPP Letter, p.2). That same letter, however, states unequivocally that the monthly trial payment is $3438, and includes coupons for payment in that amount. In this regard, I point out again that the Heymans were represented by experienced counsel in this transaction.

Mr. Heyman testified that Citi "determined my income at $2,005, and the payment on the front shows 3,438, so it didn't quite make sense. It's 31 percent of my income." (Mr. Heyman Dep. 112:20-23). He also testified that the $2,005 figure did not seem accurate, but that he could not remember his income in August of 2013. (*Id.* at 112:7-9; 222:14-18).

Mr. Heyman seeks to create a triable issue of fact as to whether $3438 (or $3446) exceeded 31% of his gross monthly income at the time. *He has, however, failed—indeed, declined—to put in any evidence or make any statement as to his actual gross monthly income in 2013.* At oral argument, I

---

[36]    The monthly payment under the Modification Agreement ($3,446) would imply a very slightly higher monthly income of $ 11,117.

repeatedly queried plaintiffs' counsel as to the true income figure. Consulting with her client, who was at her side, she could state only that her client's income was "not" $11,000, and that it "fluctuated."

The Heymans point to an August 30, 2018, email from their counsel to Citi stating that Heyman's gross monthly income was yet another figure, $2,400, while also suggesting that $2,400 represented not gross income, but 31% of gross income. (DE 110-3, at 103-104). In the answer to the email, the Citi representative, Ms. Ruiz, did not agree, but confirmed that the monthly payment, calculated under HAMP guidelines, was $3446. (*Id.* at 104) Ms. Ruiz, was a customer service representative or SPOC ("single point of contact"). She was not the underwriter, and she had no authority to correct or change the computerized calculation. (Ruiz Dep. pp. 21–23, 59–63, DE 110-3 at 131–33, 169–73). *A fortiori,* an email from the borrower's counsel to Ms. Ruiz would not affect the income figure or resulting calculations. There is no evidence that the Heymans' counsel rejected this correction or followed up. On the contrary, the Heymans accepted the Modification Agreement, executed it, and made one payment under it before declaring bankruptcy.

The parties have had a full opportunity for discovery, and neither side points to any evidence, whether tax returns, receipts, or anything else, of what Mr. Heyman's income was in the relevant period in 2013. Citi's records do not break down the calculations, but there is evidence that Citi applied the HAMP guidelines to arrive at a figure that would not exceed 31% of monthly income. Heyman claims the figure did exceed 31% of his monthly income, but does not state what his income was, despite the fact that he necessarily possesses that information. He instead chooses to pick apart inconsistencies in statements by Citi representatives (whose information necessarily came from him or his counsel) about what his income was. There is no evidence sufficient to create an issue of fact on this point.

**Escrow**. The Heymans make much of a statement in an email by Patricia Ruiz to the effect that "HAMP only covers principal and interest payments. It does not include escrow and never has." (DE 110-3, at 102). This

misstatement, if that is what is was, is inconsequential. It adds nothing to the 31% income claim discussed immediately above, and there is no evidence of the Heymans having paid anything in excess of $3446 monthly.

The monthly payment of $3446 (as noted, a negligible increase over the TPP amount of $ 3438) included escrow. *See* Modification Agreement, DE 110-3 at 92 (Principal and Interest: $2120.82; Escrow: $1325.74; Total monthly payment: $3446.56). So there is no independent HAMP noncompliance based on escrow unless that *total* figure of $3446 exceeded 31% of income.[37] That claim I have already discussed and rejected.

**Late Charges**. Next, the Heymans state that Citi failed to waive unpaid late charges. (PSJBr at 9). Guideline 9.3.2. provides that "All late charges, penalties, stop-payment fees, or similar fees must be waived upon the borrower." Guidelines, at 124; *see also* Guidelines, at 106 (Guideline 6.3.1.1 ("Late fees may not be capitalized and must be waived if the borrower satisfies all conditions of the TPP.")).

All the evidence suggests that the late fees were in fact waived. In determining the modified principal balance, the Modification Agreement notes that the Heymans owed "$0.00" in "accrued unpaid late charges." (Modification Agreement, §3(E)). The modified principal balance in the Modification Agreement therefore did not include prior late fees. The language of the

---

[37]   Then-counsel for the Heymans, Mr. Schlachter, wrote the following to Ms. Ruiz:

I see the apparent error. HAMP has a payment of principal, interest, and escrow is 31% of gross income. Gross income is $2,400 for Mr. Heyman. So I think the mod was given a high interest rate when underwriting forgot about Escrow. We would like to OFFICIALLY open a HAMP appeal. I would like underwriting to review Mr. Heymans' income again. Underwriting will see that 31% is only $2,400 and that principal, interest AND escrow has to fit into that.

(DE 110-3, at 103-104). Again, however, a fact is not established by virtue of the party's counsel having written it. Still lacking is any proof of Mr. Heyman's monthly income.

Modification is clear and unambiguous and does not require the Court to look beyond the four corners of the document.[38]

To establish that the Heymans were charged late fees, the Heymans cite a monthly statement from September of 2012. (PSJBr at 9 (citing DE 110-3, at 109, Pltf.'s Ex. D)). At that time, the Heymans owed $1,956 in late fees. (*Id.*). That statement, however, predates the Modification Agreement by almost a year. It does not demonstrate that the later Modification Agreement impermissibly capitalized or did not waive those fees. That the Heymans at one point owed late fees does not establish that Citi later breached the HAMP Guidelines. Accordingly, the Heymans have not established that Citi failed to offer a HAMP-compliant permanent loan modification on this basis.

Accordingly, summary judgment will be granted on the Heymans breach of contract claim.

### E. Promissory Estoppel, Unjust Enrichment

Citi moves to dismiss the Heymans' tort claims for promissory estoppel, unjust enrichment, and conversion, citing the economic loss doctrine. (DSJBr at 31-33). Citi further moves to dismiss the promissory estoppel and unjust enrichment claims because an express contract governed the parties' relationship and obligations. The Heymans address the economic loss doctrine only as it relates to the promissory estoppel claim. (PSJBr at 22).

"Under New Jersey law, liability based on quasi-contractual principles cannot be imposed 'if an express contract exists concerning the identical matter.'" *Hillsborough Rare Coins, LLC v. ADT LLC*, 2017 U.S. Dist. LEXIS 67113, at *15 (D.N.J. May 2, 2017) (quotation omitted); *see also Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983) ("Quasi-contract liability will not be imposed, however, if an express contract exists concerning the identical subject matter.").

---

[38]     Citibank also includes a payment history, difficult to comprehend, which is said to confirm that the late fees were waived. (DE 104-3, at 64 (Ex. I)).

Promissory estoppel is such a quasi-contract theory and it "cannot be maintained where a valid contract fully defines the parties' respective rights and obligations." *Id.* (citing *Hill v. Commerce Bancorp, Inc.*, 2012 WL 694639, at *14 (D.N.J. Mar. 1, 2012) (holding that party "cannot prevail on both a breach of contract and promissory estoppel theory for the same conduct, since promissory estoppel by its definition assumes that a contract supported by consideration has not been formed.")). "[P]romissory estoppel generally serves as a stopgap where no valid contract exists to enforce a party's promise." *Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc.*, 2015 WL 1346240, at *5 (D.N.J. Mar. 25, 2015). Unjust enrichment and promissory estoppel are both "quasi-contract theories that are unavailable when a valid contract exists." *Hillsborough Rare Coins*, 2017 U.S. Dist. LEXIS 67113, at *16.

The Heymans' promissory estoppel and unjust enrichment claims are entirely premised on the TPP agreement. The Heymans claim that "Citi promised the Heymans an affordable HAMP modification which would conform with certain terms including a promise of waiving 'prior late fees' and a '2% with 3% lifetime interest rate' and being capped at 31% including the taxes and escrow." (PSJBr at 21). The Heymans further claim that "plaintiffs did not receive such a modification after completing a HAMP TPP." (PSJBr at 21; *see* PSJBr at 22 ("the defendant made a promise for a definite benefit, an affordable modification.")). As to unjust enrichment, the Heymans argue that "defendant pocketed the plaintiff's payments made for a HAMP TPP," but failed to provide a HAMP-complaint permanent modification. (PSJBr at 30).

These same facts underlie the breach of contract claim, which premises liability on an indistinguishable theory. An express contract is a bar to promissory estoppel and unjust enrichment claims under New Jersey law when an express contract exists and addresses the subject matter at issue. The wrongdoing alleged under the Heymans' promissory estoppel and unjust enrichment claims is intrinsic to the terms and conditions of the enforceable TPP. Because there is an express contract governing the subject matter of the

promissory estoppel and unjust enrichment claims, those claims are dismissed.[39] *See Ebner v. Statebridge Co., LLC*, 2017 WL 2495408, at \*9 (D.N.J. June 9, 2017) (noting that unjust enrichment is an equitable remedy and only available when there is no express contract).

### F. Conversion

As to tort claims arising in a contractual context, the court will apply the similar but distinct economic loss doctrine.[40] "Under New Jersey law, the

---

[39]    The Heymans concede that "Citi correctly points out that if there is a[n] existing contract, the unjust enrichment claim cannot stand." (PSJBr at 30). Despite that concession, the Heymans assert that "plaintiffs are permitted to plead in the alternative and there are incentives that would cause Citi to mislead plaintiffs as it did with thousands of homeowners." (*Id.*). While it is true that the Federal Rules permit pleading in the alternative, this matter is at the summary judgment stage, at which point facts and theories are expected to have crystallized. *See Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990) (affirming grant of summary judgment on promissory estoppel claim where there was an express contract); *In re U.S. W., Inc. Sec. Litig.*, 201 F. Supp. 2d 302, 308 (D. Del. 2002) (granting summary judgment on promissory estoppel claim where express contract governed parties' relationship); *Iversen Baking Co. v. Weston Foods*, 874 F. Supp. 96, 102 (E.D. Pa. 1995) (holding same); *Myservice Force v. Am. Home Shield*, 2013 U.S. Dist. LEXIS 7027, at \*65 (E.D. Pa. Jan. 17, 2013) (holding same); *Edelen & Boyer Co. v. Kawasaki Loaders, Inc.*, 1993 U.S. Dist. LEXIS 5916, at \*6 (E.D. Pa. May 3, 1993) (granting summary judgment on promissory estoppel and unjust enrichment claim where parties' relationship was governed by an express contract).

The parties have identified a contract that defines the parties' respective rights and obligations. Even on a 12(b)(6) motion, courts have not hesitated to dismiss quasi-contract claims that are based on the same facts as a plaintiff's contract claim. *See Hillsborough Rare Coins, LLC*, 2017 U.S. Dist. LEXIS 67113, at \*17 (dismissing with prejudice promissory estoppel claim where express contract governed parties' relationship); *Smith*, 2015 U.S. Dist. LEXIS 171933, at \*23 (dismissing promissory estoppel and unjust enrichment claims based on the same facts and theory as contract claim); *Kinney Bldg. Assocs., L.L.C. v. 7-Eleven, Inc.*, 2016 U.S. Dist. LEXIS 63864, at \*14 (D.N.J. May 16, 2016); *Emtec Inc., v. Condor Tech. Solutions, Inc.*, 1998 WL 834097, at \*2-3 (E.D. Pa. Nov. 30, 1998) (plaintiff denied leave to amend complaint to include unjust enrichment claim because parties' relationship was based on express written contract).

[40]    "The preclusion inquiry in the promissory estoppel context is distinct from the economic loss doctrine." *Hunter v. Sterling Bank*, 750 F. Supp. 2d 530, 547 n.9 (E.D. Pa. 2010). Promissory estoppel and unjust enrichment theories are more properly recognized as "quasi-contract" theories, as opposed to tort theories imposing an independent legal duty. *See Hunter*, 750 F. Supp. 2d at 547 n.9 ("Whether an independent legal duty exists is not relevant in the context of a promissory estoppel claim, which centers around a clear and definite promise, as opposed to a general legal duty."); *see also*

economic loss doctrine 'defines the boundary between the overlapping theories of tort law and contract law by barring the recovery of purely economic loss in tort, particularly in strict liability and negligence cases.'" *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 244 (3d Cir. 2010) (quoting *Dean v. Barrett Homes, Inc.*, 406 N.J. Super. 453, 470 (App. Div.), *rev'd on other grounds*, 200 N.J. 207 (2009)). "The purpose of the rule is to strike an equitable balance between countervailing public policies[] that exist in tort and contracts law." *Id.* (quoting *Dean*, 406 N.J. Super. at 470).

"Whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 308 (D.N.J. 2009) (citing *Touristic Enterprises Co. v. Trane Inc.*, 2009 U.S. Dist. LEXIS 106145, at *5-6 (D.N.J. Nov. 13, 2009); *CapitalPlus Equity, LLC v. Prismatic Dev. Corp.*, 2008 U.S. Dist. LEXIS 54054, at *17-18 (D.N.J. July 16, 2008)); *see also D&D Assocs. Inc. v. Bd. of Educ. of N. Plainfield*, 2012 WL 1079583, at * 36 (D.N.J. Mar. 30, 2012) ("Whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties.").

Thus, the "critical issue" is whether the conduct underlying the tort claim is "extraneous to the contract." *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 563 (D.N.J. 2002); *see Sunburst Paper, LLC v. Keating Fibre Int'l, Inc.*, 2006 WL 3097771, at *3 n.3 (E.D. Pa. Oct. 30, 2006) (noting that to avoid application of economic loss doctrine, plaintiff must articulate "harm that is distinct from the disappointed expectations evolving solely from an agreement.") (citation omitted).[41]

---

*Smith v. CitiMortgage, Inc.,* 2015 U.S. Dist. LEXIS 171933, at *22 (D.N.J. Dec. 22, 2015). The cases cited by Citi do not address the applicability of the economic loss doctrine to a promissory estoppel claim. I confine the economic loss analysis to the tort claims.

[41]    The underlying rationale of the economic loss doctrine is that "[t]ort principles . . . are better suited for resolving claims involving unanticipated injuries, and contract principles are generally more appropriate for determining claims for consequential

Regarding the conversion claim, the Heymans assert that "defendant took plaintiff's monies paid under a false and fraudulent pretense of getting HAMP compliant modification with materially made promises that it would be affordable and enable the Heymans to retain their property while CMI had/has no legal cognizable ownership of the 'loan." (PSJBr at 23; *see* PSJBr at 27 ("plaintiffs did not receive the benefit of the payments they made under the TPP but Citi did receive a benefit, it not only kept the plaintiffs money and never made any accounting of that money but also it received payments from the federal government for each HAMP loan that it made.")).

These allegations of conversion are not distinct from or extrinsic to the contractual relationship and the obligations that arose from the TPP agreement. *See Espaillat v. Deutsche Bank Nat'l Tr. Co.*, 2015 U.S. Dist. LEXIS 66395, at *10 (D.N.J. May 21, 2015) (dismissing tort-based claims that were "rooted in a contractual relationship between the parties based upon the executed Note and Mortgage."); *see also Longo v. Envtl. Prot. & Improvement Co.*, 2017 U.S. Dist. LEXIS 85681, at *18 (D.N.J. June 5, 2017) (conversion claim barred by economic loss doctrine); *Torus United States Servs., Inc. v. Hybrid Ins. Agency, LLC*, 2015 U.S. Dist. LEXIS 144025, at *17 (D.N.J. Oct. 22, 2015) (dismissing conversion claim based on economic loss doctrine); *D&D Assocs. v. Bd. of Educ.*, 2012 U.S. Dist. LEXIS 44887, at *109 (D.N.J. Mar. 30, 2012) (concluding economic loss doctrine barred conversion claim); *Innospec Fuel Specialties, LLC v. Isochem N. Am., LLC*, 2010 U.S. Dist. LEXIS 152843, at *14 (D.N.J. Aug. 19, 2010) ("both Plaintiff's conversion and negligent misrepresentation claims rely solely on the terms of the contract rather than on any alleged extraneous conduct and are barred by the economic loss doctrine."); *Titan Stone, Tile & Masonry, Inc. v. Hunt Constr. Grp., Inc.*, 2007

damages that parties have or could have address[ed] in their agreement." *Arcand*, 673 F. Supp. 2d at 308 (quotation omitted). "The Economic Loss Doctrine is based on the principle that economic expectations between parties to a contract are not entitled to supplemental protection by negligence principles." *Saratoga at Toms River Condominium Ass'n, Inc. v. Menk Corp., Inc.*, 2014 WL 3510872, at *5 (App. Div. July 17, 2014) (citation omitted).

U.S. Dist. LEXIS 4661, at *13 (D.N.J. Jan. 22, 2007) (dismissing conversion claim under the doctrine of economic loss). The claim that Citi "converted" the Hemans' loan payments is premised on the claim that it was disentitled to them by virtue of its breach of contract.

Where a tort claim is nothing more than a recasting of a claim of breach of contract, it is barred by the economic loss doctrine. I therefore grant Citi's motion for summary judgment dismissing the conversion claim.

### G. Negligent Misrepresentation

Citi moves for summary judgment on the Heymans' negligent misrepresentation claim, asserting that there is no duty of care between a lender and borrower independent of their contractual relations. (DSJBr at 36).[42] "Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law." *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316 (2002); *see Strachan v. John F. Kennedy Mem'l Hosp.*, 109 N.J. 523, 529 (1988); *Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 53 (3d Cir. 1988). Moreover, "[t]he question of whether a duty exists is a matter of law properly decided by the court, not the jury, and is largely a question of fairness or policy." *Wang v. Allstate Ins. Co.*, 125 N.J. 2, 15 (1991).

If a defendant "owe[s] a duty of care separate and apart from the contract between the parties," a tort claim, such as negligence, may exist. *Saltiel*, 170 N.J. at 314. But the mere failure to fulfill obligations encompassed by the parties' contract is not actionable in tort. *Id.* at 316-17. Moreover, a claim for negligent misrepresentation is barred where a plaintiff has not identified a duty owed independent of the contractual relationship. *Smith*, 2015 U.S. Dist. LEXIS 171933, at *21 (citing *Perkins v. Washington Mutual, FSB*, 655 F. Supp. 2d 463,

---

[42] A claim for negligent misrepresentation requires proof of the following elements: "(1) an incorrect statement (2) negligently made (3) upon which a plaintiff justifiably relied, (4) and which resulted in economic loss or injury as a consequence of that reliance." *Sarlo v. Wells Fargo Bank, N.A.*, 175 F. Supp. 3d 412, 425 (D.N.J. 2015); *see also Premier Health Assocs., LLC v. Med. Tech. Sols.*, 2018 U.S. Dist. LEXIS 144274, at *22-23 (D.N.J. Aug. 24, 2018).

471 (2009) (finding that economic loss doctrine barred negligence claim brought by plaintiff-mortgagor against defendant-mortgagee because both were parties to the mortgage contract and there was no other duty owed)); *see also Skypala v. Mortg. Elec. Registration Sys.*, 655 F. Supp. 2d 451, 461 (D.N.J. 2009).

"[C]ourts have declined to recognize negligent misrepresentation claims arising out of a lender's alleged breach of duty during the loan modification process." *Hartman v. Wells Fargo Bank, N.A.*, 2015 Bankr. LEXIS 2783, at *18 (Bankr. D.N.J. Aug. 19, 2015), *aff'd*, 2019 U.S. App. LEXIS 3745, at *6 (3d Cir. Feb. 6, 2019) (citing *Legore v. OneWest Bank, FSB*, 898 F. Supp. 2d 912, 919 (D. Md. 2012) (dismissing mortgagor's negligent misrepresentation claim because lender's obligation to review loan modification application under HAMP "does not create the 'special circumstances' required to form a tort duty under Maryland law"); *Wigod*, 673 F.3d at 573-74 (dismissing mortgagor's negligent misrepresentation claim against servicer because any duties servicer may have had to "provide accurate information to [the Plaintiff] arose directly from their commercial and contractual relationship" and therefore "do not sound in the torts of negligent misrepresentation.")); *see also Del. Valley Bindery Inc. v. Ramshaw*, 2017 U.S. Dist. LEXIS 150921, at *13 (D.N.J. Sep. 18, 2017) (holding same); *Rost*, 2015 U.S. Dist. LEXIS 148703, at *16 (holding same).

The Court agrees with Citi that the Heymans have not set forth a duty of care separate and apart from the alleged contractual relationship. The Heymans' opposition makes clear that their negligent misrepresentation claim is based on the parties' course of dealing during the loan modification process. (*See* PSJBr at 24 ("The Heymans relied upon information . . . that they were being considered For a HAMP modification and submitted new confidential documents in order to be evaluated for one, and subsequently made the HAMP TPP payments[.] . . . CMI clearly knew HAMP would not be available for the loan.").

In addition, the Heymans cite Congressional testimony of Citi's CEO Vikram S. Pandit from March of 2010, and argue that Citi has admitted that it owes such a duty. (PSJBr at 26).[43] This testimony does not relate to the Heymans and their loan modification process, it predates the events of this case, and it does not address the legal issue of a duty of care. It provides no basis for the Court to depart from well-established case law holding that a loan servicer does not owe a mortgagor a duty of care outside of the obligations imposed by their contractual relationship. Accordingly, summary judgment will be granted to Citi on the Heymans' negligent misrepresentation claim.

### H. Consumer Fraud Act

#### i. Whether CFA claim is barred by HAMP

Citi argues that there is no private right of action under HAMP, and that any CFA claim based on a violation of HAMP regulations must therefore be dismissed. (DSJBr at 16-17 (citing *Sinclair*, 519 Fed. App'x at 730 (citation omitted); *Bukowski v. Wells Fargo Bank, N.A.*, 2017 WL 4077015 (D.N.J. Sept. 14, 2017), *aff'd in part, vacated in part, remanded*, 2018 WL 6584119 (3d Cir. Dec. 13, 2018); *Slimm*, 2013 U.S. Dist. LEXIS 62849).

---

[43]    The testimony quoted by the Heymans is as follows:

> And, in 2009, we provided $439.8 billion of new credit in the U.S., including approximately $80.5 billion in new mortgages and $80.1 billion in new credit card lending. We have carefully tracked and accounted for our use of TARP capital, which we used specifically to support new lending to individuals, families, communities and businesses in the U.S. This week, we published our fifth quarterly TARP report providing transparency on how we have used TARP capital to help support new U.S. lending initiatives. Taxpayers have a right to know how their investment was put to use, and we were the only bank to publish regular reports on the use of TARP money.

(PSJBr at 25-26) (quoting http://online.wsj.com/public/resources/documents/testimony-20100304-pandit.pdf).

I also note that the Heymans' argument in support of its negligent misrepresentation claim raises fraud and the elements of fraud — a claim that has not been pled. (PSJBr at 25). The Court will not entertain this new claim, raised for the first time in opposition to a summary judgment motion. *See Bey*, 2006 WL 361385, at *11.

Citi principally relies on the District Court's decision in *Bukowski*, 2017 WL 4077015. (DSJBr at 17). In that case, the plaintiffs applied for a loan modification under HAMP with Wells Fargo. 2017 WL 4077015 at *1. Wells Fargo provided plaintiffs with a three-month TPP, which stated that plaintiffs would receive a permanent modification provided that their three trial payments were submitted on time. *Id.* After plaintiffs timely made their TPP payments, Wells Fargo sent plaintiffs a permanent loan modification agreement, which required plaintiffs to make "an interest bearing lump sum payment" of approximately $152,819.03. *Id.* at *3. That newly-unveiled term violated HAMP and was not provided for in the TPP. *Id.* Based on the HAMP violation, the plaintiff asserted a state-law CFA claim.

The U.S. Court of Appeals for the Third Circuit reversed the District Court's dismissal of the CFA count, recognizing that while "HAMP does not provide a private cause of action," that "does not mean that it precludes state law claims altogether." *Bukowski*, 2018 WL 6584119, at *3 (citing *Wigod*, 673 F.3d at 581 ("The absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law.")).[44] The Third Circuit reasoned that the plaintiffs' "complaint does not allege a stand-alone HAMP violation; instead, it alleges that Wells Fargo violated the NJCFA by making

---

[44]     New Jersey courts "have 'adopt[ed] the Seventh Circuit's *Wigod* position that HAMP does not preclude state-law based claims.'" *Bukowski*, 2018 WL 6584119, at *3 (quoting *Smith*, 2015 WL 12734793, at *4). In *Wigod*, the Seventh Circuit explained that the plaintiff's state-law claims did "not allege that Wells Fargo engaged in unfair or deceptive business practices by violating HAMP guidelines. . . . Rather, the plaintiff contended that 'Wells Fargo's misrepresentation and omission of material facts misled [the plaintiff] to believe she would receive a permanent modification under HAMP and that it implemented its HAMP compliance procedures in a way designed to thwart borrowers' legitimate expectations." *Bukowski*, 2018 WL 6584119, at *3 (quoting *Wigod*, 673 F.3d at 585-86).

    Similarly, in *Bukowski*, the plaintiffs claimed that that they were misled by Wells Fargo's representations "concerning their eligibility for a permanent HAMP modification," and that those representations violated the CFA. *Bukowski*, 2018 WL 6584119, at 4.

material misrepresentations, which in turn led the couple to believe that their permanent modification would be HAMP-compliant." *Id.*

Like the Third Circuit in *Bukowski*, I must conclude that "HAMP in no way precludes state law causes of action" under the CFA. *See id.* The CFA claim is distinct from a (nonexistent) HAMP claim, because the Heymans assert that they were misled into believe they would receive a HAMP-compliant loan modification but did not in fact receive it. *See Laughlin*, 2014 WL 2602260, at *6 ("the Court finds that allegations of 'unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact' during the loan modification process constitute unlawful conduct in violation of the NJCFA."); *cf. Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1116 (N.J. 2011) ("[C]ollecting or enforcing a loan, whether by the lender or its assignee, constitutes . . . an activity falling within the coverage of the CFA.").

Accordingly, I would not grant summary judgment dismissing the Heymans' CFA claim on the threshold basis that it is barred as a matter of law.

### ii.  Merits of CFA Claim

I therefore turn to the merits of the CFA claim. Here, I find that the Heymans have failed to raise a factual issue as to Citi's commission of an unlawful or deceptive business practice in connection with the HAMP process.

The CFA was passed to address "sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices." *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 271 (1978). As "remedial legislation," the NJCFA "should be construed liberally." *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 377 n.1 (2007) (hereinafter "*IUOEL 68*").

The relevant portion of the CFA provides as follows:

[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false

promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. Ann. § 56:8-2. The term "advertisement" is defined, in relevant part, as "the attempt . . . to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise . . . or to make any loan." N.J. Stat. Ann. § 56:8-1(a).

To state a claim under the CFA, a plaintiff must allege the following three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss. *IUOEL 68*, 192 N.J. at 389; *see D'Argenzio v. Bank of Am. Corp.*, 877 F. Supp. 2d 202, 208 (D.N.J. 2012). Importantly, "[u]nlike common law fraud, the NJCFA does not require proof of reliance." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 606 (3d Cir. 2012).[45]

Unlawful conduct falls into three general categories: affirmative acts, knowing omissions, and violation of specific regulations under the CFA. N.J. Stat. Ann. §§ 56:8-2, 56:8-4; *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17 (1994). An affirmative misrepresentation under the CFA is "one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Mango v. Pierce-Coombs*, 370 N.J. Super. 239, 250-51 (App. Div. 2004) (internal quotations and citation omitted); *see Arcand*, 673 F. Supp. 2d at 296-97. Affirmative acts must be "'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer." *New Jersey Citizen Action v. Schering-Plough*

---

[45]    Citi argues contractual ratification in the analysis of their CFA claim, but fail to cite case law that has applied contractual ratification to a consumer protection action. (DSJBr at 17-19).

*Corp.*, 367 N.J. Super. 8, 13 (App. Div. 2003) (quoting *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 429 (1995)).

"There is no precise formulation for an 'unconscionable' act that satisfies the statutory standard for an unlawful practice." *D'Agostino v. Maldonado*, 216 N.J. 168, 184 (2013). The CFA "establishes 'a broad business ethic' applied 'to balance the interests of the consumer public and those of the sellers." *Id.* (quoting *Kugler v. Romain*, 58 N.J. 522, 543-44 (1971)). "Often, the determination of whether business conduct 'stand[s] outside the norm of reasonable business practice' presents a jury question." *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 514 (D.N.J. 2009), *aff'd*, 374 Fed. App'x 341 (3d Cir. 2010).

A CFA claim may arise from the collection, enforcement, or modification of a loan. *See Gonzalez*, 25 A.3d at 1116 ("[C]ollecting or enforcing a loan, whether by the lender or its assignee, constitutes....an activity falling within the coverage of the CFA" and disapproving financing deals that turned debtors into "cash cows" without ever restoring their mortgages to current status); *Block*, 221 F. Supp. 3d at 594 ("courts in this Circuit have held that misrepresentations regarding mortgage modifications fall within the NJCFA, since they are made in connection with the 'subsequent performance' of a mortgage under the statute."); *Arias*, 439 N.J. Super. at 277 ("an agreement that purports to bind a debtor to make payments while leaving the mortgage company free to give her nothing in return" may violate CFA); *Laughlin*, 2014 WL 2602260, at *6 ("a loan servicer's business practices during the loan modification process are covered by the CFA").

The underlying allegations of unlawful conduct are familiar, and have been discussed elsewhere in this opinion: The Heymans were misled into believing that they were being considered for a "HAMP-compliant" modification, which they did not receive; the May 16, 2013 payment should have been applied as a TPP payment; a Citi representative advised the Heymans by telephone that they would receive a 2% interest rate; the modified loan

60

payments exceed 31% of the Heymans' gross income; and Citi failed to waive late fees. (*See* SAC ¶¶47, 50-52; PSJBr at 18-21).[46]

I have already held that the submissions of the Heymans fail to create a triable factual issue as to these factual allegations of wrongful conduct. *See* Section IV.D.ii., *supra*. For the reasons stated above, then, Citi is entitled to summary judgment dismissing the CFA claim.

### I.  Real Estate Settlement Procedures Act ("RESPA")

Citi moves for summary judgment on the Heymans' RESPA claim on three bases: (1) Mr. Heymans' request to the CFPB and OCC were not "qualified written requests" under RESPA; (2) Citi nonetheless responded to Mr. Heymans' complaints on October 25, 2013 via letter (Pamela Decl. Ex. M); and (3) the Heymans have not established any damages as result of Citi's alleged RESPA violation. (DSJBr at 39-40).

The Heymans admit that Citi responded to their August 2013 complaints to the CFPB and the OCC. (PSJBr at 32-34). They challenge the sufficiency of Citi's response. (*See* PSJBr at 34 ("Here, the CMI response was lacking in information, and claimed that certain fees could not be adjusted due to 'contractual requirements.' This is not a meaningful answer.")). The Heymans do not address Citi's arguments regarding damages. (*See* PSJBr at 32-34).

In Section I.i, I summarize the RESPA framework at some length. In Section I.ii, I state the far narrower grounds to grant summary judgment.

---

[46]    When asked to identify "all facts" relating to Citi's unlawful conduct upon which the Heymans' CFA claim is based, the Heymans attested as follows:

> Defendant engaged in a course of continuous conduct that reasonably induced Plaintiff into believing that he was being considered for a mortgage modification under the HAMP guidelines. In addition, the Defendant collected Plaintiff's payment that was intended for payment under the TPP and Defendant knew or should have known this, as they did not accept payment prior to the payment of May, 2013, which was converted by the Defendant. Despite affirmative statements that the Plaintiff was being considered for a modification under HAMP guidelines, Defendant did not render Plaintiff a modification in conformity with the HAMP guidelines.

(DE 104-4, Ex. B, Interrogatory No. 18).

61

### i.    RESPA Framework

"RESPA establishes a mechanism for borrowers to obtain information from and to contest errors made by their mortgage servicers." *Schepisi v. Santander Bank, N.A.*, 2019 WL 699959, at *2 (D.N.J. Feb. 20, 2019). To that end, the statute requires that servicers of mortgage loans respond to inquiries from borrowers regarding their loans within a set amount of time. *See* 12 U.S.C. § 2605. RESPA simply requires that, upon "receipt" of a Qualified Written Request ("QWR"), a loan servicer must "provide the borrower with a written explanation" that includes "a statement of reasons for which the servicers believes that the account is correct." 12 U.S.C. § 2605(e)(2)(B); *Hutchinson v. Del. Sav. Bank FSB*, 410 F. Supp. 2d 374, 382 (D.N.J. 2006) (RESPA requires servicers to "(a) provide written notice to the borrower acknowledging receipt of the request; (b) take appropriate action with respect to the inquiry either by making corrections or providing a written explanation or clarification; and (c) protect the borrower's credit rating by not reporting" overdue payments related to the QWR).

RESPA defines a QWR as follows:

> a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—
>
>> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>>
>> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).

The regulations promulgated under RESPA permit a servicer to "establish an address that a borrower *must use* to request information," provided that the servicer provides written notice of the designated address to the borrower. 12 C.F.R. § 1024.36(b) (emphasis added); *see also* 12 C.F.R. §1024.35(c). "[I]f a

servicer establishes a designated QWR address, 'then the borrower must deliver its request to that office in order for the inquiry to be a 'qualified written request.'" *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181 (2d Cir. 2014) (quoting Real Estate Settlement Procedures Act, Section 6, Transfer of Servicing of Mortgage Loans (Regulation X), 59 Fed. Reg. 65,442, 65,446 (Dec. 19, 1994)). Ignoring an QWR address carries harsh consequences for the borrower. *Wease v. Ocwen Loan Servicing, L.L.C.*, 912 F.3d 768, 776 (5th Cir. 2019), *aff'd in part, rev'd in part on other grounds*, 2019 U.S. App. LEXIS 4375, at *15 (5th Cir. Feb. 13, 2019).

The U.S. Court of Appeals for the Third Circuit has not yet ruled on whether failure to submit a request to the designated address provides grounds for the dismissal of a RESPA claim. Every other Circuit to address this issue, however, has held that a servicer is not required to respond to a "misaddressed QWR — and that responding to such a letter does not trigger RESPA duties." *Id.* (citing *Bivens v. Bank of Am., N.A.*, 868 F.3d 915, 921 (11th Cir. 2017) ("Because [the borrower] failed to address his QWR to [the servicer]'s designated address for QWR receipt, [the servicer] had no duty to respond to it."); *Roth*, 756 F.3d at 181-82 ("[F]ailure to send the request to the designated address does not trigger the servicer's duties under RESPA."); *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1149 (10th Cir. 2013) ("Receipt at the designated address is necessary to trigger RESPA duties.").[47]

---

[47]     *But see McMillen v. Resurgent Capital Servs., L.P.*, 2015 U.S. Dist. LEXIS 121379, at *15 (S.D. Ohio Sep. 11, 2015) ("[T]he crucial inquiry is whether the mortgage servicer received the borrower's correspondence, because the statutory language indicates that receipt triggers the servicer's duty to respond under RESPA."); *Benner v. Bank of America, NA*, 917 F. Supp. 2d 338 (E.D. Pa. 2013) (evaluating 24 C.F.R. § 3500.21(e)(1) and concluding that plain language does not require borrower to use designated address).

Both *Benner* and *McMillen* emphasize that the language of the statute itself does not mandate that correspondence be received at a specific address in order to trigger RESPA obligations. As noted in *McMillen*, however, most courts which have analyzed this issue have disagreed with the reasoning articulated in *Benner*. *McMillen*, 2015 U.S. Dist. LEXIS 121379, at *15. *Benner* was decided before *Berneike*, which was the first decision from a Court of Appeals to address the issue. In *Berneike*, 708 F.3d at 1148, the Tenth Circuit noted that Congress had not defined the requirements for

RESPA provides for three different courses of action on the part of the servicer after receiving a QWR. 12 U.S.C. § 2605(e)(2). A servicer can make corrections to the account. 12 U.S.C. § 2605(e)(2)(A). A servicer can, after an investigation, provide the borrower with a written explanation or clarification that explains why certain information cannot be obtained or provided by the servicer. 12 U.S.C. § 2605(e)(2)(C).

The last manner of response, the only one applicable here, provides that a servicer shall:

> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—
>
> > (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
> > (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

12 U.S.C. § 2605(e)(2)(B).[48]

Section 2605(e)(2)(B) requires only that the loan servicer provide "a statement of the reasons for which the servicer *believes*" the accounting is

---

"receipt" of a QWR, and the legislative history failed to provide useful guidance on how Congress would have interpreted when a QWR is deemed received for purposes of the imposition of statutory duties. Because Congress was silent and the Consumer Protection Bureau was empowered to "prescribe such rules and regulations, to make such interpretations . . . as may be necessary to achieve the purposes of" RESPA, the Tenth Circuit Court of Appeals considered and adopted the agency's interpretation of the statute, as reflected in the relevant regulation mandating receipt at the servicer's designated address. The Bureau interpreted the statute to allow servicers the option of requiring borrowers to submit QWRs through a designated address.

"Communication failing to meet the requirements of RESPA and its implementing regulation amounts to nothing more than general correspondence between a borrower and servicer," and does not trigger RESPA. *Id.* at 1149. Allowing servicers to designate an exclusive address for QWRs does not defeat the intention of RESPA and provides consumers "greater and more timely information on the nature and costs of the settlement process." *Id.* at 1148-49.

[48]    Because these three methods of compliance are presented in the disjunctive, a servicer is not required to employ more than one. Moreover, § 2605(e)(2)(A) and (B) are, in most factual scenarios, mutually exclusive.

correct. (Emphasis added.) "Under RESPA, it is irrelevant whether the servicer's understanding of the loan modification agreement is correct, so long as it is reasonable." *Vassalotti v. Wells Fargo Bank, N.A.*, 732 F. Supp. 2d 503, 509 (E.D. Pa. 2010). In other words, "[a] reasonable explanation of the servicer's belief is sufficient, even if it is later determined that the belief is erroneous." *Id.* (holding that servicer's response to borrower's QWR regarding escrow account was reasonable because there was "an open question of contract interpretation with respect to whether the May 22, 2008 agreement capitalized the escrow deficit into the modified loan balance," and that if servicer's "interpretation is incorrect," then "that error is properly the subject of a breach of contract claim," not a RESPA violation) (citing *Gruninger v. America's Servicing Co.*, No. 08-572, 2010 U.S. Dist. LEXIS 15139, at *15 (E.D. Pa. Feb. 22, 2010) (finding no RESPA violation where defendant "responded to all of the plaintiff's letters and, among other things, provided detailed explanations" for its reasoning)).

Finally, in order to succeed on a RESPA claim, the Heymans must establish that they suffered actual damages. 12 U.S.C. § 2605(f)(1). This requirement has two components: actual harm and causation.

RESPA allows for recovery of "any actual damages to the borrower," as well as statutory damages in the case of "a pattern or practice of noncompliance." 12 U.S.C. § 2605(f)(1)(A) (providing that "[w]hoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts: in the case of any action by an individual, an amount equal to the sum of . . . any actual damages to the borrower as a result of the failure"). "Actual damages encompass compensation for any pecuniary loss including such things as time spent away from employment while preparing correspondence to the loan servicer, and expenses for preparing, photocopying and obtaining certified copies of correspondence." *Cortez v. Keystone Bank, Inc.*, 2000 WL 536666, at *12 (E.D. Pa. May 2, 2000). In terms of statutory damages, "[n]umerous courts have held that a plaintiff cannot properly establish entitlement to additional statutory damages based

upon a single violation of the statute." *Binder v. Weststar Mortg., Inc.*, 2016 U.S. Dist. LEXIS 90620, at *42-43 (E.D. Pa. July 13, 2016) (citing cases).

However, "alleging a breach of RESPA duties alone does not state a claim under RESPA." *Hutchinson*, 410 F. Supp. 2d at 383. A plaintiff must, "at a minimum, also allege that the breach resulted in actual damages." *Id.* (citing *Cortez v. Keystone Bank*, 2000 U.S. Dist. LEXIS 5705 at *40 (E.D. Pa. May 2, 2000) (claimant under 12 U.S.C. § 2605 must allege pecuniary loss attributable to alleged RESPA violation)); *see also Straker v. Deutsche Bank Nat'l Trust*, 2012 WL 7829989, at *11 (M.D. Pa. Apr. 26, 2012) ("the borrower has the responsibility to present specific evidence to establish a causal link between the financing institution's violation and their injuries.").

The causation element requires a plaintiff to present evidence that damages were incurred as a result of an inadequate RESPA response as opposed to other wrongdoing, such as damages incurred because of an improper foreclosure or servicing of the loan. *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 593 (7th Cir. 2016) (affirming dismissal of RESPA claim where plaintiffs failed to put forth evidence that they were injured specifically by defendant's inadequate RESPA response as opposed to damage caused by "initiating a foreclosure action, increasing interest rates, initiating a loan modification procedure, and the like."); *Patrick v. CitiFinancial Corp., LLC*, 2015 U.S. Dist. LEXIS 118969, at *13 (M.D. Ala. Sep. 8, 2015) (finding that asserted damages, including loss of equity and use of property, were due to foreclosure, not inadequate RESPA response); *Clark v. Bank of Am., N.A.*, U.S. Dist. LEXIS 85135, at *16 (E.D. Mich. June 18, 2013) (holding that plaintiff failed to plead causation where the alleged harm "occurred prior to the time period of when the QWR was sent."); *Mernatti v. Nationstar Mortg., LLC*, 2013 U.S. Dist. LEXIS 146327, at *21-22 (E.D. Mich. Oct. 10, 2013) (granting summary judgment on RESPA claim where plaintiff failed to demonstrate damages as a result of defendants' purported RESPA violation where "the sole basis for Plaintiff's damages is his contention that Nationstar improperly serviced his loan."); *Webb*

*v. Chase Manhattan Mtg. Corp.*, 2008 WL 2230696 at * 14 (S.D. Ohio May 28, 2008) (dismissing RESPA claim where damages alleged would have been incurred by plaintiff prior to QWR correspondence); *Collier v. Wells Fargo Home Mortgage*, 2006 WL 1464170, *3 (N.D. Tex. May 26, 2006) (granting summary judgment where plaintiffs had failed to allege damages specifically relating to RESPA violation, as distinct from damages flowing from alleged improper servicing of mortgage).

### ii.    Analysis of the Heymans' RESPA claim

Citi alleges that it has designated a specific address for RESPA requests, and that the Heymans failed to submit their complaints to that designated address. (DSJBr at 39 (citing Pamela Decl. ¶15, Ex. L)). The monthly statement from Citi to the Heymans includes a "customer service" section in which Citi designated an address for QWRs. (DE 110-3, at 109, Pltf.'s Ex. D). Specifically, the monthly statement provides as follows:

> **For Residential Customers Only**: PURSUANT TO §6 OF RESPA, A "QUALIFIED WRITTEN REQUEST" REGARDING THE SERVICING OF YOUR LOAN MUST BE SENT TO THIS ADDRESS: CITIMORTGAGE, INC., ATTN: CUSTOMER RESEARCH TEAM, PO BOX 10002, HAGERSTOWN, MD 21747-0002. A "qualified written request" is written correspondence, other than notice on a payment coupon or statement, which includes your name, account number and the reason(s) for the request.

(DE 110-3, at 109, Pltf.'s Ex. D).

That is a sufficient designation. A servicer may designate a QWR address by identifying an address as a QWR address on a borrower's monthly mortgage statement. The Second Circuit in *Roth v. CitiMortgage Inc.*, 756 F.3d at 182-83 reviewed and accepted the sufficiency of Citi's designation of address provided to borrowers in their monthly statements when evaluating RESPA claims.[49] *See Berneike v. CitiMortgage*, 708 F.3d at 1149.

---

[49]    The Second Circuit's decision quotes directly from the monthly mortgage statement, and Citi's designation of address in *Roth* is substantively the same as the designation of address in the Heymans' monthly mortgage statement. *See* 756 F.3d at 182.

Following the Second and Tenth Circuits, I conclude that the Heymans' complaints, which were not submitted to Citi's designated address as stated in the Heymans' monthly mortgage statements, did not trigger Citi's RESPA duties. *See In re Patrick,* 2014 Bankr. LEXIS 5115, at *51-52 (granting summary judgment on RESPA claim based on Citi's designated address in monthly statement); *see also In re Residential Capital, LLC,* 533 B.R. 874, 879 (Bankr. S.D.N.Y. 2015) (concluding that letter that was not sent to designated address on monthly mortgage statements did not qualify as QWR); *Kelmetis v. Fannie Mae,* 2017 U.S. Dist. LEXIS 11169, at *23 (N.D.N.Y. Jan. 27, 2017) (holding that servicer's duty to respond was not triggered where customer failed to send letter to address identified on monthly mortgage statement as the location where QWRs "must be sent"); *see also Griffin v. Citifinancial Mortg. Co., Inc.,* 2006 U.S. Dist. LEXIS 6709, 2006 WL 266106, at *2 (M.D. Pa. Feb. 1, 2006) (dismissing RESPA claim where plaintiff sent request to Citifinancial's bankruptcy attorney rather than Citifinancial itself).

Accordingly, Citi is entitled to summary judgment on this claim because its duties under RESPA were not triggered. That entitlement is not undermined by Citi's later having responded to Mr. Heyman's complaints. *See Berneike,* 708 F.3d at 1149 (declining to find that Citi waived its "statutory right" to receive QWRs at designated addresses when Citi nonetheless responded to plaintiff's letters complaining of errors).

Additionally, the Heymans do not address Citi's motion based on the lack of evidence of damages. (*See* PSJBr at 32-34). Typically, when an issue is not presented in the arguments section of the brief, that issue is deemed waived. *See Travitz,* 13 F.3d at 711. I have, however, examined the Heymans' responses to interrogatories, wherein they "itemized" the following damages:

    a. Five payments, sum total in the amount of $17,438.80.

    b. Defendant also recapitalized, instead of waiving various late fees.

    c. Due to its refusal of the short sale, and demand for a $10,000 payment, the plaintiffs have been forced to remain in this

horrendous situation of owning a house that is underwater due to defendant's reckless lending practices.

d. Plaintiffs' credit is wrecked, and they are unable to purchase another house, and are unable to access credit normally as they would have been if they had been able to sell this house at a short sale.

e. Emotional distress does not lend itself to easy calculation, nor do punitive damages.

f. Plaintiffs have incurred attorney fees owing to Citi's breach of the covenant of good faith and fair dealing and other tortious and illegal behavior as described in the SAC.

(DE 104-4, at 31, Def.'s Ex. B). These categories of damages, whatever their validity, have not been factually linked to an inadequate RESPA response, as opposed to the Heymans' other complaints about the loan modification process. On the additional basis of failure to establish damages or damages causation, then, summary judgment is warranted on the Heymans' RESPA claim.

The Court concludes that the Heymans' RESPA claim fails because (1) RESPA was not triggered by the Heymans' correspondence to CFPB and OCC; and (2) the Heymans' have not presented any proof of damages that can be traced to an inadequate RESPA response. Accordingly, the Court does not address additional arguments concerning the sufficiency of Citi's response.[50]

---

[50]    Although not addressed by the parties, it appears that the Heymans face another bar to their RESPA claim. A qualified written request must be related to "the *servicing* of [the] loan." 12 U.S.C. § 2605(e)(1)(A)-(B) (emphasis added). RESPA defines servicing as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3). RESPA's definition of servicing narrowly focuses on the exchange of "payments" between a servicer and a borrower. 12 U.S.C. § 2605(i)(3); *Hager v. CitiMortgage, Inc.*, 2017 U.S. Dist. LEXIS 26900, at *18 (D.N.J. Feb. 27, 2017) (concluding that "'servicing' cannot be so broadly read as to encompass documents and information that are merely related to other aspects of the loan, such as its origination, transfer, or continuing validity.").

Accordingly, requests for information that do not relate to "servicing" a loan do not fall within the ambit of RESPA. Courts routinely interpret RESPA "as requiring a QWR to relate to the servicing of a loan, rather than the creation or modification of a loan." *Gates v. Wachovia Mortg., FSB*, 2010 U.S. Dist. LEXIS 64268, at *9 (E.D. Cal.

## J. Slander of Title

The Heymans' slander of title claim is based on the following: "Citi falsely reported the plaintiffs' debts (publication) by claiming in (among other places) public documents recorded in official county records that plaintiff's lien is greater than it actually is, due to illegally charging late fees and interest during the automatic stay and then capitalizing those charges into

June 28, 2010); *see Mercado v. Bank of Am., N.A.*, 2013 WL 2933217, at *4 (D.N.J. June 13, 2013) ("[L]etters challenging only a loan's validity or its terms are not qualified written requests that give rise to a duty to respond under § 2605(e)."); *see also Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 667 (9th Cir. 2012) (concluding that letter challenging "the terms of the loan and mortgage documents, premised on an assertion that the existing documents [did] not accurately reflect the true agreement" and "request[ing] modification of those documents" did not relate to servicing loan and thus servicer's obligations under RESPA was not triggered); *Watson v. Bank of Am., Nat'l Ass'n*, 2016 U.S. Dist. LEXIS 85580, at *15 (S.D. Cal. June 30, 2016) (finding that "requests relating to loan modification are not related to 'servicing' of the loan" under RESPA); *In re Bell-Wiggins*, 2016 Bankr. LEXIS 4268, at *9 (Bankr. D.N.J. Dec. 6, 2016) (holding that plaintiffs had not pled RESPA violation where "correspondence sent by Plaintiffs questions the reason for Defendants' denial of the loss mitigation application and alleges errors related thereto."); *Mbakpuo v. Wells Fargo Bank, N.A.*, 2015 U.S. Dist. LEXIS 94414, at *28 (D. Md. July 20, 2015) (holding that plaintiff's "requests for a loan modification did not relate to the servicing of a loan because they did not relate to Wells Fargo 'receiving any scheduled periodic payments from a borrower pursuant to the terms of a loan.'"); *Mayer v. EMC Mortg. Corp.*, 2014 U.S. Dist. LEXIS 55521, at *14 (N.D. Ind. Apr. 22, 2014) ("[A]ny actions related to any loan modification are outside the term 'servicing', and thus cannot be pursued under RESPA."); *Tavake v. Chase Bank*, 2012 U.S. Dist. LEXIS 173411, at *11 (E.D. Cal. Dec. 5, 2012) ("RESPA only obligates loan servicers to respond to or refrain from acting upon a borrower's QWR relating to the servicing of his or her loan, which does not include a loan modification, plaintiffs' RESPA claim fails."); *Wallace v. Bank of Am.*, 2011 U.S. Dist. LEXIS 97792, at *13 (D.N.J. Aug. 30, 2011) ("Plaintiff's written applications for loan modification do not fall within the protections of RESPA"); *Philips v. Bank of Am. Corp.*, 2010 WL 1460824, at *4 (N.D. Cal. April 9, 2010) (finding defendant had no duty to respond to plaintiff's QWR because it related to loan modification, and not servicing; *but see In re Coppola*, 596 B.R. 140, 155 (Bankr. D.N.J. 2018).

Mr. Heymans' complaints to the CFPB and OCC dispute the terms of the modified loan. (*See* Pamela Decl. Ex. L; SAC ¶70 ("Here, plaintiff Abraham Heyman wrote to the consumer protection agency on a QRW (*complaining about the loan modification that Citi offered*) and the document was forwarded to Citi, which answer the plaintiff's concerns unsatisfactorily and failed to correct the noted deficiencies." (emphasis added)). The vast majority of case law has recognized that such a letter does not related to "servicing" a loan, and therefore does not impose an obligation on the servicer to respond under RESPA.

the loan balance." (SAC ¶65). The crux of the claim is that "Citi published inflated amounts of debt . . . in the bankruptcy record and in county property records and recorded a fake assignment to a US Bank trust." (PSJBr at 31). Citi seeks summary judgment on the Heymans' claim of slander of title claim because they have not established the existence of a false publication, special damages, or malice.

Slander of title is a species of defamation. "The tort of slander of title has been defined in New Jersey as a publication of a false assertion concerning plaintiff's title, causing plaintiff special damages." *Peters Well Drilling Co. v. Hanzula*, 242 N.J. Super. 16, 24 (App. Div. 1990) (citation omitted). To establish a cause of action for slander of title, a plaintiff must show: "(1) publication (2) with malice (3) of false allegations concerning plaintiff's property or product (4) causing special damage, i.e., pecuniary harm." *Sys. Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1140 (3d Cir. 1977); *see also Stewart Title Guar. Co. v. Greenlands Realty, L.L.C.*, 58 F. Supp. 2d 370, 388 (D.N.J. 1999).

The Heymans allege that the publication of the reaffirmation agreement in the bankruptcy court and the Modification Agreement in the records of the County clerk constitute publication of "false" statements. (Mr. Heyman Dep. II at 337:24-338:5; DE 104-4, at 137).[51] However, the Heymans have failed to identify an actionable falsehood. The genuineness of the reaffirmation or Modification Agreement is not disputed. The Heymans have failed to present evidence that the substance of these documents was misrepresented.

Rather, the Heymans simply reargue their complaints about the loan modification process and allege that Citi "clearly know 'prior late fees' were not waived and acted with malice" in publishing "these fees and interest." (PSJBr at

---

[51]    The Heymans also alleged that "[b]y claiming that plaintiffs owed it money that had actually been discharged in bankruptcy, the defendant committed slander of title against the plaintiffs." (SAC ¶64). However, the Heymans have not pointed to anything in the record to suggest that Citi publicized discharged debts, and their opposition only focuses on the reaffirmation agreement.

31). The Heymans, to be sure, have contested the HAMP-compliance of the Modification Agreement. But they fail to show how filing of the Modification Agreement, which they Heymans executed and agreed to, was false. The terms of the Modification Agreement and reaffirmation agreement are accurately reported. The interest rate in the agreement, for example, is 5.25%, and that is what is reported in the filed document.

Moreover, the record is bereft of evidence that the Heymans suffered pecuniary loss as a result of these publications in the records of the county clerk or the bankruptcy court. They contend that they were "threatened with foreclosure" and "[c]redit reports show higher debt." (PSJBr at 31). The Heymans further claim that they "are unable to sell or market the property." (PSJBr at 32). There is no obvious, plausible factual connection, however, between the *recordation* of such terms (as opposed to the terms themselves) and any damage to the Heymans. Moreover, none of these allegations of damage are supported by citations to evidence in the record. (*See* PSJBr at 31-32). The Court is not required to credit unsupported statements, and Rule 56 "does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"—although to some degree I have done so. *McCann v. Kennedy Univ. Hosp., Inc.*, 596 F. App'x 140, 146 (3d Cir. 2014) (citing *American Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013)); *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 210 (D.N.J. 2001) ("it is not the Court's obligation to sift through the record searching for a genuine issue of material fact. Rather, it is the parties' obligation to show the absence or existence of such an issue.").

Finally, the Heymans have not presented any proof of "special damages." Special damages are ordinarily proved in a slander of title action by evidence of a lost sale or the loss of some other pecuniary advantage, such as attorney's fees that were incurred to clear the title. *See* Restatement (Second) of Torts, § 633 (1979). No such proofs are proffered here.

Accordingly, summary judgment is granted as to the Heymans' slander of title claim.

## V.    Motion to Appoint Rent Receiver

As noted above, the Heymans have maintained the two-family house as a rental property while paying nothing on the mortgage. Citi's second motion seeks to assign all rental income generated from the mortgaged property to Citi, or, alternatively, to appoint a rent receiver to collect rents, make the necessary tax payments for the mortgaged property, and to hold any excess monies in trust for the protection of the mortgagee's interest in the property. (DRRBr at 8-9). Citi has not, however, filed a foreclosure action against the Heymans. (DRR Reply at 9).

Federal Rule of Civil Procedure 66 empowers a federal court to appoint a receiver in a pending litigation.[52] *See Leone Indus. v. Associated Packaging, Inc.*, 795 F. Supp. 117, 120 (D.N.J. 1992) (citing *Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982), *cert. denied*, 459 U.S. 1069, 103 S. Ct. 488, 74 L. Ed. 2d 631 (1982)). An evidentiary hearing is warranted when the record fails to disclose sufficient facts to warrant appointment of a receiver. *Id.* at 120 n.6. As a general matter, it is appropriate for a court to appoint a receiver when the party seeking receivership demonstrates "the imminent danger of property being lost, injured, diminished in value or squandered, and where legal remedies are inadequate." *Leone*, 795 F. Supp. at 120 (citing *McDermott v. Russell*, 523 F. Supp. 347, 352 (E.D. Pa. 1981), *aff'd*, 722 F.2d 732 (3d Cir. 1983)); *see also Barclays Bank, P.L.C. v. Davidson Ave. Assocs., Ltd.*, 274 N.J. Super. 519, 524 (App. Div. 1994) (appointing receiver where because "the

---

[52]    Rule 66 provides, in its entirety, the following:

These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued. But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule. An action in which a receiver has been appointed may be dismissed only by court order.

Fed. R. Civ. Proc. 66.

failure to pay taxes and insurance has placed Barclay's security interest at considerable risk.").

Here, Citi points to a specific contractual entitlement to this relief. Most commonly, however, the application for a rent receiver arises in a foreclosure proceeding. "A district court, in its discretion, may appoint a receiver to collect rents and profits and manage the property during the pendency of a foreclosure proceeding." *United States v. Berk & Berk*, 767 F. Supp. 593, 597 (D.N.J. 1991). "The presence of a contractual stipulation to the appointment of a receiver is given considerable weight in the court's evaluation of whether a rent receiver should be appointed." *In re Inv'rs Warranty of Am., Inc. v. B.W.E. Dev., L.L.C.*, 2010 WL 2557559, at *5 (D.N.J. June 23, 2010) (quotation and citation omitted); *Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 905 F. Supp. 2d 604, 615 (D.N.J. 2012) (recognizing that appointment of rent receiver is typically drastic, except "where the parties have agreed *ex ante* that, in the event of a default, the lender has the right to all rent payments and to the appointment of a receiver"). However, the existence of a contractual provision "is not the only factor to be examined . . . the Court also considers other equitable factors." *In re Inv'rs Warranty of Am., Inc.*, 2010 WL 2557559, at *5.

The court is required to consider a series of equitable factors in determining whether to exercise its discretion to appoint a receiver:

> [(1) whether] the property is inadequate security for the loan; [(2) whether] the mortgage contract contains a clause granting the mortgagee the right to a receiver; [(3)] the continued default of the mortgagor; [(4)] the probability that foreclosure will be delayed in the future; [(5)] the unstable financial status of the mortgagor; [and (6)] the misuse of project funds by the mortgagor.

*Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 905 F. Supp. 2d 604, 614 (D.N.J. 2012) (quotations and citations omitted; alteration added); *see Phx. NPL, LLC v. 1130 NB Realty, LLC*, 2015 U.S. Dist. LEXIS 168017, at *4 (D.N.J. Dec. 16, 2015) (appointing rent receiver where borrower was in continued default, "failed to pay property taxes and municipal water charges for the mortgaged

property in the amount," and loan documents granted mortgagee right to have receiver appointed).

Appointment of a receiver is limited to movants who have a real interest in the property held by a defendant. *Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 825 (3d Cir. 1959);[53] *see Cornerstone Realty Partners, Inc. v. Rabolli*, 2017 U.S. Dist. LEXIS 39850, at *4 (D.N.J. Mar. 17, 2017). The right to receive the rents upon default is entirely independent of, and in addition to, the option of taking possession. *Int'l Bus. Machines Corp. v. Axinn*, 290 N.J. Super. 564, 568 (App. Div. 1996) (interpleader action to determine third-party rights to rental income).

"Such an appointment . . . should not be made lightly; it is appropriate only in the face of compelling circumstances and in the absence of a less drastic remedy." *Leone*, 795 F. Supp. at 120; *see Maxwell v. Enter. Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942) (recognizing that "it has been judicially noted almost innumerable times that the appointment of a receiver is an extraordinary, a drastic ... remedy ... not to be resorted to if milder measures will give the plaintiff, whether creditor or shareholder, adequate protection for his rights." (internal citations omitted)).

I address each of the equitable factors in turn. Some of them might, other things being equal, require an evidentiary hearing. The record before me, however, suffices to establish that a receiver should not be appointed at the present time.

First, in terms of the adequacy of the property as security, Citi avers that the value of the mortgaged property is less than the amounts due and owing under the Note and Mortgage. Citi obtained an exterior Broker's Price Opinion, which estimated the value of the property as $465,000 as of May 3, 2018. (DE 103-2, at ¶4). The unpaid principal balance, as of October 26, 2018, is

---

[53]    The Heymans re-argue that Citi lacks standing, which they raised, and this Court rejected, in the summary judgment motion. The Heymans' "waiver" argument based on the "release" of mortgage in the records of the Passaic County Clerk's Office is unavailing for the reasons stated above. *See* n.3, *supra*.

$516,035.09; the escrow deficiency is $77,684.77; and unpaid, accrued interest is $92,155.47. (DE 103-2, ¶17). The Heymans have not put forth any evidence regarding the adequacy of the property as security.

Second, the mortgage documents contain a clause that provides for the assignment of rents or the appointment of a receiver. The clause in the original mortgage documents allows for the "absolute" and "unconditional" assignment of rental income in the case of default, provided that Citi gives both to the borrower and to the tenant. (DE 103-2, Ex. B, at 33).

Citi has given notice to the Heymans but has not given notice to the tenants. Prior to an assignment of rents, the tenants must be given notice under this provision. The Heymans, to some extent, have impeded Citi's ability to provide notice. The names (or surnames) of the tenants have been furnished, but Mr. Heyman claims to have destroyed the leases and deposited the rental income into a personal bank account without keeping records.

The Assignment of Rents clause allows for the unconditional and absolute assignment of rental income from the moment notice is given, or from April 14, 2014.

It is not disputed that the Heymans have defaulted on their loan and have not made a single mortgage payment since September 2013. The Heymans, despite receiving significant rental income, have not attempted to apply that income to the mortgage or identified any prospect of curing their default.

The extent and seriousness of any mismanagement of funds is subject to some dispute. Mr. Heyman has presented some indication that he has maintained the property, spending money on a sewer line and furnace. (DE 115-1, at ¶12). Mr. Heyman, however, has not substantiated these assertions with documentary proof. (*See id.*). *See Orange Land Co. v. Bender*, 96 N.J. Super. 158, 166 (App. Div. 1967) ("[a] mortgagee in possession is bound to account for all rents, issues and profits received by him. . . and must deduct the allowance for these matters from the amount due on the mortgage.").

Regarding the probability that foreclosure will be delayed in the future, there is no information whatever. Citi served the Heymans with a notice of default in 2014, but has not filed an action in foreclosure. I pressed Citi's counsel for an explanation at oral argument, but received very little in response. Counsel did acknowledge that, once these motions were resolved, filing of a state-court action in foreclosure would likely follow.

Despite the (to Citi) galling prospect of a mortgagor using the property as a source of income while paying nothing on the mortgage, Citi's failure to pursue the obvious remedy of foreclosure is what gives me pause here. If Citi is entitled to foreclose, it should do so. By bidding in its debt at a sheriff's sale, it will accede to the rights of an owner, including the collection of rents. Appointment of a rent receiver is a cumbersome, second-best remedy. It will tend to prolong the twilight state of affairs in which the defaulting mortgagor continues to own the premises, while the mortgagee enjoys most (but not all) of the privileges of ownership, and no one has an adequate incentive to bring this long-simmering dispute to a close. If and when Citi files an action in foreclosure, it may seek a rent receiver in the state court. I, however, am disinclined to grant such secondary or provisional remedies to a party which, for whatever reason, has declined to pursue its primary remedy.

The motion for assignment of rents or appointment of a rent receiver is therefore denied.

## VI. Conclusion

For the reasons stated above, Citi's motion for summary judgment (DE 104) is granted in its entirety.

Citi's motion to assign rental income, or, in the alternative, to appoint a rent receiver (DE 103) is denied.

An appropriate order follows.

Dated: June 27, 2019

**Kevin McNulty**
**United States District Judge**